[No. 4282. Decided August 26, 1902.]

THE STATE OF WASHINGTON, *Respondent*, v. A. P. VANCE, *Appellant*.

APPEAL — WHEN AFFIDAVIT INCORPORATED IN RECORD.

Where a motion for continuance and an affidavit supporting it were filed as one paper, and the order of the court denying the motion expressly recites that the court had read the affidavit presented in support of the motion, the journal entry of the order would make the affidavit a part of the record, without the necessity of incorporating it by means of a bill of exceptions or a statement of facts.

SAME—CHALLENGE TO JURY PANEL—WHEN PART OF RECORD.

A written verified challenge to the panel of jurors, served upon the adverse party and filed in court, is properly a part of the transcript on appeal, without the necessity of being incorporated therein by bill of exceptions or statement of facts.

SAME — SELECTION OF JURORS — RECORD ON APPEAL.

All the proceedings regulating the selection of jurors under Laws 1901, p. 204, are a part of the general records of the superior court in each case tried by jury, and, by virtue of their nature and purpose, when properly certified by the clerk of the superior court, will be considered on appeal, independent of any bill of exceptions or statement of facts.

CONTINUANCE — SUFFICIENCY OF SHOWING.

A motion for a continuance in a criminal case, on the ground that the defendant did not have time to prepare for his trial and procure witnesses for his defense was properly denied where it appears from the record that there was a period of forty-one days between the commission of the crime and the date of trial, and more than a month between the dates of preliminary examination and trial; that defendant was represented by attorney during the whole of the time; that the scene of the crime was located thirty-five miles from the county seat, but in no way shown to be inaccessible; and where the affidavit for continuance failed to comply with the provisions of Bal. Code, § 6929, in such matters, in that it did not give the names of any absent witnesses nor what they would testify to, nor did it show that in case of a continuance any testimony could have been procured that was not produced on the trial.

SAME — GROUNDS FOR — ILLNESS OF ATTORNEY.

The granting or refusing of a motion for a continuance being a matter within the sound discretion of the court, the refusal of the court to grant a continuance applied for on the ground that one of defendant's attorneys had been suffering from a surgical operation upon his throat and was thereby prevented from working as effectually as he otherwise could have done, will not be disturbed on appeal, especially where it appears that during a portion of the time prior to trial the defendant had the assistance of another attorney.

JURY — SELECTION BY COMMISSIONERS — PERFORMANCE OF STATUTORY DUTIES — PRESUMPTIONS.

The action of jury commissioners in selecting the names of only 960 out of 5,000 persons in the county qualified to act as jurors is not a ground for challenge to the panel, where the law requiring the jury commissioners to "select the names of all the qualified jurors in the county, so far as they may be able to ascertain the same from the latest tax rolls and poll books," invests them with discretion to select none but persons whom they

believe to be of good repute for intelligence and honesty, none
that they have been requested to select, nor the name of any
person known to be interested in any cause pending in court,
and in all their selections to endeavor to promote only the im-
partial administration of justice; the presumption being, in the
absence of evidence to the contrary, that public officers charged
with the performance of official duty have duly performed the
same in the proper manner.

SAME — CHALLENGE TO PANEL — PRESUMPTION AS TO SUSTENTATION
   BY EVIDENCE.

   Under Bal. Code, § 6933, requiring a challenge to a jury panel
to be proved to the satisfaction of the court, it will be presumed,
where the record shows that the court heard testimony in passing
upon the challenge which was not brought up on appeal, that
it was sufficient to sustain the court's conclusion.

SAME — JURISDICTION OF COURT TO SUMMON JURORS.

   Where the court is authorized to cause the names of trial
jurors to be drawn from the jury box, it has authority to issue
to the sheriff of the county its process to require the attendance
upon the court of the jurors so drawn.

SAME — SELECTION OF JURY COMMISSIONERS — CONSTITUTIONAL LAW
   — SPECIAL PRIVILEGES TO ONE CLASS OF CITIZENS.

   The right given to members of the bar by the jury act of
1901 (Laws 1901, p. 204) to recommend four eligible persons
from the bar of the county, from whom the court shall select
two to act as commissioners for the selection of jurors, is not
the conferring of a privilege or immunity upon any class of
citizens such as is prohibited by § 12, art. 1, of the state con-
stitution.

SAME — PEREMPTORY CHALLENGES — WAIVER OF RIGHT — EFFECT.

   Under Bal. Code, § 4987, which provides that plaintiff and
defendant may exercise the right of peremptory challenge alter-
nately and that "the panel being filled and passed for cause,
after said challenge shall have been made by either party, a
refusal to challenge by either party in the said order of alter-
nation shall not defeat the adverse party of his full number of
challenges, but such refusal on the part of the plaintiff to
exercise his challenge in proper turn shall conclude him as to
the jurors once accepted by him, and, if his right be not ex-
hausted, his further challenges shall be confined, in his proper
turn, to talesmen only," the waiver by the prosecution of the
right to exercise a peremptory challenge would apply only to the

jury in the box at the time, and would not preclude the prosecution from exercising the right of peremptory challenge upon talesmen called subsequently, where the number of challenges allowed the prosecution had not been exhausted, even if it resulted in giving the prosecution the last challenge.

MURDER — THEORY OF DEFENSE — RELEVANCY OF EVIDENCE.

Where the defense interposed in a homicide case is that another than accused fired the fatal shot, it is not error to exclude evidence tending to show that the mind of accused had been wrought to a frenzied condition over trouble concerning his marital relations.

INSTRUCTIONS — EXCEPTIONS TO — TIME OF TAKING.

Under Bal. Code, § 5053, which provides that exceptions to a charge to a jury or to a refusal to give requested instructions, may be taken "after the jury shall have retired to consider of their verdict and, if practicable, before the verdict has been returned," an exception taken after the close of the trial will not be considered on appeal, where no extension of time in which to take exceptions had been asked, and where it appears from the record that it was practicable to have taken the exceptions between the time of the jury's retirement and of the rendition of their verdict.

SAME — REFUSAL OF REQUESTS — WHEN WITHOUT PREJUDICE.

Refusal to give requested instructions is not error, where those given by the court adequately cover the points upon which the requests were made.

SAME — COMMENT ON FACTS.

A requested instruction which tells the jury what facts would raise a reasonable doubt was properly refused, for the reason that it amounted to a comment on the facts.

NEW TRIAL — NEWLY DISCOVERED EVIDENCE — WANT OF DILIGENCE.

The refusal of the court to grant a new trial on the ground of newly discovered evidence was not error, where it appears that the evidence could, by the exercise of reasonable diligence, have been produced upon the original trial.

MURDER — VERDICT IN FIRST DEGREE — SUFFICIENCY OF EVIDENCE.

A verdict of murder in the first degree is warranted where the evidence shows threats made by accused indicating general malice and a purpose to kill some one, and that, after provoking a quarrel with a man, and after laying aside his revolver at his adversary's request for an equal combat, he grabs up his

weapon again in the heat of conflict, and shoots and kills the man with whom he was scuffling.

Appeal from Superior Court, Pierce County.—Hon. WILLIAM H. SNELL, Judge. Affirmed.

*John Leo* and *John L. McMurray,* for appellant.

*Fremont Campbell, Charles O. Bates* and *Walter M. Harvey,* for the State.

The opinion of the court was delivered by

WHITE, J.—On the 16th day of September, 1901, an information was filed in the superior court for Pierce county by the prosecuting attorney of that county against the appellant, charging him with the crime of murder in the first degree. On the 17th of September, 1901, the appellant was arraigned, and a motion to quash and a demurrer to the information were filed by Samuel F. Mc-Anally, as attorney for defendant. On the 18th day of September, 1901, the motion was denied, and the demurrer overruled. On the same day the appellant entered a plea of not guilty. On the 12th of October, 1901, a written motion, with the affidavit of Samuel F. McAnally attached thereto, and referred to in the motion, was made for the continuance of the cause for a reasonable time, suitable for the purposes stated in the affidavit. The affidavit, omitting the formal parts, was as follows:

"Samuel F. McAnally, being first duly sworn, on his oath says: That he is one of the attorneys for the above named defendant, and up to this time has been the only and sole attorney for said defendant; that the acts alleged to constitute the offense of which the defendant is charged were committed or alleged to have been committed thirty-five miles from the city of Tacoma, at the village of Eaton-ville, which is not accessible by any rapid or convenient mode of travel, and that to thoroughly investigate all

necessary facts connected with the defense of the defendant necessarily required a great deal of time and travelling and for the first twenty days that affiant was engaged as defendant's attorney he was suffering from the effects of a surgical operation in the throat and was thus prevented from working as effectually as he otherwise could and would have done; that the defendant has been and is a poor man unable to furnish his attorney with adequate means of transportation and facilities for investigation, and that the time allowed for preparation of this case for trial has been wholly inadequate for the performance of the duties required, and by reason of the shortness of time and other facts aforesaid the defendant has been and is unable to present his defense in this cause on the 14th day of October, 1901, being the time assigned for trial of the same without the consent of the defendant; that affiant is reliably informed by a witness subpoenaed by the state, and by others, that there were persons other than are now known to the defendant, that is, whose identity is unknown to the defendant, were at or near the place where the offense is alleged to have been committed at or near the time the offense was alleged to have been committed, and that affiant has made and continues to make strenuous endeavors to find said persons but so far has been unable to do so.

"Of the foregoing facts affiant informed this court and the attorneys for the plaintiff at the time this cause was noted for trial. That recently, towit: on the afternoon of the 10th day of this month the attorneys for plaintiff notified defendant through affiant, his attorney, of their intention to indorse on the information herein the names of two witnesses, J. E. Noel and William Buchanan, concerning whose testimony the defendant is not informed, but that, if their testimony is material, the same has been known, or with ordinary diligence might have been known, to the attorneys for plaintiff ever since the preliminary hearing in this cause, September 9, 1901, and that it would be an injustice to the defendant to allow the indorsement of said names at this time; that the defendant and his attorneys are not desirous of delaying the trial of

this cause any longer than is absolutely necessary for the administration of substantial justice, and that the only delay sought is for the purpose of ascertaining the identity of and securing the attendance of all persons as witnesses who have any material information concerning the facts alleged in the information, and that such knowledge or information is not now in the possession of the defendant or his attorneys."

On the same day the court denied said motion, and in the order denying the same recited: "And the court having read the affidavit of Samuel F. McAnally in support of said motion . . . doth overrule and deny said motion." The cause came on for trial on the 14th day of October, 1901, and the trial continued from day to day, Sundays excepted, until the 24th day of October, 1901, when the jury returned a verdict as follows: "We, the jury in the case of the State of Washington, plaintiff, vs. A. P. Vance, defendant, find the defendant guilty of murder in the first degree. L. A. Chamberlain, Foreman"— which verdict was received by the court and entered. Immediately after the reception of the verdict, and before being discharged, the jury handed the following to the court: "We, the jurors do recommend the clemency of the court in the case of State of Washington vs. A. P. Vance." This was signed by all the jurors. The jury was then discharged. The respondent moves for an order to strike from the transcript the affidavit of Samuel F. McAnally, above recited, for the reason that said affidavit has not been preserved or made a part of the record in the cause by any bill of exception or statement of facts. The affidavit is not referred to in the judge's certificate to the statement of facts, and is not made a part of the record by any bill of exception. The affidavit and motion seem to have been filed as one paper. It appears from the order of the court made upon the motion and the motion itself

that the affidavit was considered by the court in passing upon the motion. From this it can be readily determined that the affidavit formed part of the proceedings in the court below, and that the attention of the trial court was directed to it. The affidavit was an integral and inseparable part of the motion, attached thereto, constituting a part thereof, and setting forth, in verified form, the grounds of the motion, and the order of the court expressly recites that the court "had read the same in support of the motion." The order of the court is a part of the record. It furnishes conclusive evidence that the affidavit was presented to and considered by the trial court in passing on the motion for a continuance. In passing upon a similar question in *Clay v. Selah Valley Irrigation Co.,* 14 Wash. 543 (45 Pac. 141), we said:

"There is nothing to show that they [affidavits] were all presented or read to the court below on the hearing of the motion."

For that reason we said that, "in order to entitle them to a consideration here the fact that they were so presented should have been certified to by the court in some manner." The journal entry of the order is a part of the proceedings of the court, and the court has full control of all such entries. § 4722, Bal. Code. Where such journal entry recites as a fact that in passing upon the motion the court read the affidavits in support of the motion, we think that fact sufficiently appears, and in such a case it is not necessary that such affidavits be certified in a bill of exceptions or statement of facts. The cases cited by respondent of *Clay v. Selah Valley Irrigation Co.,* 14 Wash. 543 (45 Pac. 141); *Winsor v. McLachlan,* 12 Wash. 154 (40 Pac. 727); *State v. Howard,* 15 Wash. 425 (46 Pac. 650); *State v. Anderson,* 20 Wash. 193

(55 Pac. 39); *Armstrong v. Van De Vanter,* 21 Wash. 682 (59 Pac. 510), are distinguishable, in the particular indicated, from the present case. The motion to strike the affidavit for a continuance is denied.

The respondent also moves for the same reasons to strike from the transcript the following papers and records and journal entries: The challenge to panel of jurors and the verification thereof by Samuel F. McAnally; the record of the meeting of the Pierce county bar and certificate thereto, to the effect that on June 28, 1901, the bar of Pierce county met, selected and nominated certain persons, whose names were to be submitted to the judges of the superior court of Pierce county, from which names jury commissioners were to be selected, under the act providing for and regulating the selection of jurors (Laws 1901, p. 204); the journal entry of the orders of the superior court of Pierce county appointing jury commissioners under said act; the journal entry of the superior court of Pierce county showing the appearance of the jury commissioners, and their oath of office as administered to them by one of the judges of said court; the journal entry of the court containing the list of jurors chosen by the jury commissioners; the certificate of the jury commissioners and their verification thereto of the selection of the names of qualified jurors, and the deposit of such names in the jury box; the journal entries of the order of the court, departments 1 and 2, of date of September 14, 1901, ordering a panel of forty petit jurors in each department for attendance upon the court, to be drawn from the jury box, and the issuance of a venire to the sheriff to summon such jurors; the list of the petit jurors drawn under the order of September 14, 1901, and certificate of the clerk of the court to the same; and summons to the

petit jurors drawn under said order, and return of the sheriff to the same.

The challenge to the panel, omitting formal parts, is as follows:

"Comes now the above named defendant, A. P. Vance, presents these his exceptions to, and challenges the panel of jurors heretofore drawn in the above court September 14, 1901, for trial of causes in the ensuing calendar month of October, 1901, and before whom this defendant is brought on to be tried, and his said challenge is made for the following reasons:

"1st. That the jury commissioners heretofore appointed by the superior court of the state of Washington for the county of Pierce, have not selected the names of all the qualified jurors in said county as far as they were able to ascertain the same from the latest tax rolls and poll books of said county, as required by section 3 of chapter 97 of the Session Laws of 1901, and in this connection this defendant alleges that there are upon the tax rolls of the aforesaid county 5,000 names of qualified jurors, over and above those who are interested in any case pending in the court, by which the commissioners were appointed, and the commissioners so appointed as aforesaid have only selected as the qualified jurors of the county of Pierce less than 1,000 names, and in this respect have failed to substantially conform to the requirements of section 3 of Chapter 97 of the Laws of 1901, as aforesaid.

"2d. That on the 14th day of September, 1901, when the panel hereby challenged was drawn, the jury commissioners and the clerk of the court failed and neglected to comply with all the requirements of the law, providing for and regulating the selection of jurors in this, that the list of names so chosen and which comprises the panel hereby challenged was not, at the time of drawing said names, prepared and checked in open court with the list of jurors heretofore selected by the jury commissioners for this county, and as evidence of this fact this defendant hereby refers to and makes a part thereof, the certificate of Robert P. Rigney, clerk of the superior court of Pierce

county, Washington, made and entered on the 14th day of September, 1901, and recorded in Journal 79, at page 276, in Department 1, of above entitled court.

"3d.   The defendant further objects to and challenges the panel of jurors heretofore and on the 14th day of September, 1901, drawn by this court upon the ground that nowhere in the laws of 1901 or in any law of the state of Washington is there any provision for the summoning of said jurors to attend upon the above entitled court, and nowhere in said law is there any authority for the delivering of the venire of jurors constituting this panel, to any person for the purpose of summoning the said panel of jurors, for attendance upon the above entitled court, and this defendant alleges that the venire for the panel of jurors hereby challenged has been delivered to the sheriff of Pierce county, Washington, for the purpose of having him summon the said panel of jurors, and some of the same have been so summoned, and there is no authority under the laws of the state of Washington for said sheriff to perform said duty, and the above panel of jurors so drawn by said jury commissioners is void.

"4th.   That chapter 97 of Laws of Washington, 1901, being the laws of Washington in reference to the regulating the selection of jurors passed by the Senate March 4, 1901, and passed by the House March 13, 1901, and approved by the governor March 16, 1901, is unconstitutional and void.

"5th.   That the panel of jurors that were drawn as aforesaid and the portion thereof which now remains subject to call for jury duty for this term of court are challenged for the reason that, after said panel was so drawn, this court did on the 1st day of October, 1901, excuse a large number of said jurors without sufficient cause for so doing, whereby this defendant was prejudiced in this, that said panel as it thus remains so decreased and depleted will not furnish a sufficient number to constitute a full, fair, impartial jury to try defendant for the offense of which he is charged in the above entitled cause."

"Wherefore defendant challenges and excepts to said entire panel of jurors and that portion of the same yet remaining."

This challenge is verified by Samuel F. McAnally, to the effect that, "he has knowledge of the things therein contained, knows the contents thereof and believes the same to be true." The verification is a part of the challenge. This challenge was served on the prosecuting attorney, and filed with the clerk of the court in the cause on the 12th of October, 1901. On the same day the journal entry shows the following order in the case:

"And now on this 12th day of October, A. D. 1901, this cause came on for hearing on the challenge of the defendant to the panel of the petit jurors and the same was submitted to the court, the plaintiff appearing by Walter M. Harvey and Charles O. Bates, deputy prosecuting attorneys for Pierce county, and the defendant appearing by Samuel F. McAnally and J. L. McMurray, his attorneys, and the court, having heard the testimony and argument of counsel and being fully advised in the premises doth overrule and deny said challenge, to which ruling the defendant excepts and exception is allowed by court."

The law requires that challenges to the panel shall be in writing and sworn to. § 6933, Bal. Code. The challenge sought to be stricken was in writing and sworn to, and was served on the prosecuting attorney and filed. The challenge so verified was, as appears from the journal entry, submitted to the court. The verification to the challenge was a part of the challenge. The certificate of the clerk shows that the challenge is a part of the files in the case. It is not necessary that such a paper be made a part of the record by a bill of exceptions or a statement of facts. When filed it becomes part of the record. The other parts of the transcript moved against are parts of

the general records of the superior court of Pierce county, required under the act of 1901, *supra,* regulating the selection of jurors, and by virtue of their nature and purpose, when properly certified by the clerk of the lower court, will be taken notice of by this court, independent of any bill of exception or statement of facts. They are part of the record of each particular jury case tried by a jury organized under the jury act of 1901. The motion to strike is therefore denied.

The first error assigned is the overruling of the defendant's motion for a continuance of the trial, to give the defendant proper and reasonable time to prepare for trial. The affidavit of Mr. McAnally in support of said motion is hereinbefore set out. There were no opposing affidavits. The record discloses that there were forty-one days between the commission of the offense and the commencement of the trial. The preliminary hearing was on September 9, 1901, more than thirty days before the case was called for trial. The offense was committed at the village of Eatonville. The affidavit claims that the place "was not accessible by any rapid or convenient mode of travel." This is a mere conclusion. The means of access to the place, and whether or not it was upon a traveled road, and the character of the surrounding country were not set forth. The judge of the court is presumed to be reasonably familiar with the villages in the county where he presides, and the ordinary means of access to the same. The affidavit fails to disclose when the affiant was employed as attorney for the appellant. The record discloses that, when the information was filed, the affiant was acting as the attorney for the appellant. This was on the 16th of September, 1901. The fair inference from the record, at the time the motion was made, is that the affiant acted as attorney for the appellant at the time of the preliminary

examination. In one of the affidavits for a new trial, it is shown that Mr. McAnally acted as attorney for appellant from September 3, 1901. From the time of the filing of the information to the time of trial was twenty-eight days. Eatonville is thirty-five miles from the city of Tacoma. So far as its accessibility is concerned, that is about all that the affidavit discloses. There is no showing that the attorney, after his employment, was not able to go to Eatonville, where the offense was committed. The character of the investigation, or whether or not he made any investigation at Eatonville, is not shown. It is not shown that the poverty of the defendant prevented the investigation of the facts. Wherein the poverty of the appellant deprived his attorney of the facilities for investigation is not shown. The statements in the affidavit in this respect are general in their nature, and mere conclusions, unsupported by any showing of facts.

Section 6929, Bal. Code, provides:

"A continuance may be granted in any case on the ground of the absence of evidence, on the motion of the defendant, supported by affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to procure it, and also the name and place of residence of the witness or witnesses, and the substance of the evidence expected to be obtained; and if the prosecuting attorney admit that such evidence would be given, and that it be considered as actually given on the trial, or offered and overruled as improper, the continuance shall not be granted."

None of the provisions of this section are complied with in the affidavit for continuance. The names of the witnesses are not given, nor is it stated with any reliability that any witnesses could be procured; neither does it state what said witnesses would be expected to testify to, or, in fact, anything about what their testimony would be.

There was no opportunity for the prosecuting attorney to admit that the evidence would be given, and it nowhere shows or intimates that if the case had been continued, any testimony could have been procured that was not procured at the trial. It shows that the attorney for defendant has made strenuous efforts to find said witnesses, but has been unable so to do; but it does not show that there is any probability of his ever finding any other witnesses than those whom he at that time knew of. In a recent case, *State v. Newton, ante,* p. 373, in passing on a similar motion, we said:

"The record fails to show even an attempt to comply with the requirements of this section of the statute, and, without some such showing as the statute requires, a trial court is not compelled to grant a continuance."

The affidavit for continuance is insufficient under all the decisions. The affidavit for continuance was filed on the 12th day of October, 1901, and it refers to the fact that on the 10th day of October, 1901, the state notified appellant, through his counsel, of their intention to indorse on the information the names of two witnesses, namely, J. E. Noel and William Buchanan, concerning whose testimony the appellant is not informed, and then states that it would be an injustice to the appellant to allow the indorsement of said names at said time; but no continuance is asked for on account of the indorsement of the said names. It appears from the supplemental transcript filed by the respondent that on the 10th day of October notice was served upon counsel for appellant that the state would apply on the 14th day of October for permission to indorse upon the information, as witnesses against the appellant, the names of Noel and Buchanan, and on said 14th day of October, 1901, as shown by the affidavit of Charles O. Bates and Walter M. Harvey, found in the supple-

29—29 Wash.

mental transcript, appellant's attorney was notified of what the state expected to prove by said witnesses, so that counsel for appellant had full notice and knowledge of what was expected to be proved by these witnesses, and no objection was made to their names being indorsed upon the information, and appellant in his brief does not predicate any error upon the ruling of the court allowing these two witnesses to be indorsed.

Developments which transpired soon after the trial, as shown by the affidavits of Lena Tudsen, Alice McCabe, and Samuel F. McAnally, made in support of a motion for a new trial, should not be considered in passing upon the error now under consideration. These matters will be considered further on, in passing upon the error assigned in overruling and denying defendant's motion for a new trial. It is claimed in appellant's brief, however, that Mr. McAnally, appellant's attorney, during the pendency of the trial, was suffering from the effects of a surgical operation, and therefore incapacitated from working on the preparation of the case as effectually as he otherwise could and would have done. The affidavit states simply that for the first twenty days of the preparation of the case Mr. McAnally was suffering from the effects of a surgical operation in the throat, and thus was prevented from working *as effectually* as he otherwise could and would have done; but the record fails to disclose that the defendant was in any way prejudiced. The record discloses that Mr. McAnally, at least from the 12th day of October, 1901, had the assistance of another attorney, in the person of Mr. J. L. McMurray, and it does not appear that appellant was unable to secure such assistance prior to that date, and after the case was set for trial. While it is true that sickness and consequent incapacity of counsel are in some instances sufficient ground for continuance, still, the au-

thorities cited by appellant in his brief are not in point
on the facts disclosed in the affidavit. In *Rice v. Melendy,*
36 Iowa, 166, cited by the appellant, it was held that a
continuance should be granted where it has shown that
the main attorney in the case, who was alone conversant
with the facts, and relied upon to try it, was confined to
his bed by sickness, and much of the time delirious, and
conversation with him upon business was prohibited by his
physician; and it was further shown that it was impossible
for any other attorney to prepare for the trial of the
cause at that term, owing to its importance and complexity.
In the case of *Thompson v. Thornton,* 41 Cal. 626, cited by
appellant, it was held that a continuance should be granted
where a party had stated his case to his attorney, and was
advised that he had a good defense on the merits, and his
attorney was unable to attend the trial by reason of ill-
ness of two members of his family, so extreme in its char-
acter that no prudent man could think of leaving them
for any length of time in the condition they were in, and
the party first ascertained this on the morning of the day
of trial, and was unable to procure counsel who under-
stood the facts. The other cases cited have but little bear-
ing upon the facts in this case. The granting or refusing
of a motion for a continuance is a matter resting in the
sound discretion of the court, and we are satisfied, from
an examination of the affidavit and the facts set forth
therein, that there has been no abuse of such discretion by
the lower court in refusing to grant the continuance.

The second error assigned is in overruling appellant's
objection to the jury panel from which the jurors who
tried the case were taken. The act of 1901, *supra,* provid-
ing for and regulating the selection of jurors in counties
from the first to the seventh classes, provides that, by
an order made in open court, and entered of record, the

court shall appoint as jury commissioners two electors of the county chosen by the court from four electors recommended by the bar of the county at a meeting of the bar called by the court for that purpose. When appointed, the commissioners shall appear in open court, and take jointly an oath in the following form:

· "You do solemnly swear (or affirm) that you will, during your term of office, perform the duties of jury commissioners faithfully and to the best of your ability; that in selecting persons to be drawn as jurors you will select none but persons whom you believe to be of good repute for intelligence and honesty; that you will select none that you have been or may be requested to select; and in all your selections you will endeavor to promote only the impartial administration of justice; so help you God." Laws 1901, p. 204, § 1.

Within a certain time, the commissioners are required to "select the names of all the qualified jurors in the county so far as they may be able to ascertain the same from the latest tax rolls and poll books of the county and deposit the same written on separate slips of paper of uniform size, shape, and color in a box to be furnished by the clerk of the court for that purpose." The law further expressly provides that in selecting and depositing such names the commissioners shall in all things observe their oath, and that they, in addition, shall not select the name of any person who is to them known to be interested in any cause pending in the court. Id. § 3. From this box the trial jurors are to be drawn in the manner pointed out. The general laws of the state prescribe the qualifications of jurors as follows:

"A person is not competent to act as a juror unless he be:

1. An elector of the state of Washington.

2. A male inhabitant of the county in which he is re-
turned, and who has been an inhabitant thereof for the
year next preceding the time he is drawn or called.

3. Over twenty-one years of age.

4. In the possession of his natural faculties and of
sound mind.

5. A person who has been convicted of a felony is not
competent to act as a juror." § 4735, Bal. Code.

Under the act of 1901 the commissioners are not re-
quired to place the names of all qualified jurors of the
county in the box. They are to select from the qualified
jurors, so far as they may be able to ascertain, such per-
sons only as the jury commissioners shall believe are of
good repute for intelligence and honesty. In making this
selection great discretion is lodged with the commissioners,
and that discretion should not be disturbed, unless mani-
fest abuse is shown. The intention of the law is, not as
argued by appellant's attorney to prevent discrimination
between qualified jurors, but to select from qualified jurors
honest persons, having the capacity to know and under-
stand, and readiness to comprehend, and who are not
interested in causes pending in court, and who will act
impartially in the discharge of their duties as jurors. The
affidavit of the appellant's attorney is to the effect that he
believes the statements in his affidavit to be true, not that
they are true. The good faith and fairness of the commis-
sioners in making the selection is not assailed. We are
asked to conclude that because there are on the tax rolls
of the county 5,000 names of qualified jurors over those
interested in any case pending in court, that in selecting
but 960 names from this number the jury commissioners
must have disregarded the requirements of the law. The
law constantly presumes that public officers charged with
the performance of official duty have not neglected the

same, but have duly performed it, at the proper time, and in the proper manner. In the absence of evidence to the contrary, this presumption will prevail, and, where the rights of the public require it, the presumption in favor of .due performance is liberal, and evidence to overthrow it must be clear. The law requires the challenge to be proved to the satisfaction of the court. § 6933, Bal. Code. The order of the court further shows that in passing upon the challenge the court heard testimony. This testimony is not before us. The presumption is that such testimony sustained the conclusion reached by the court. There is no merit in the first reason assigned for challenge to the panel. The second reason assigned in the challenge is without merit. The supplemental record discloses that the statute as to comparison and checking of the names of the jurors was literally complied with. The third reason assigned in the challenge is not commented upon in the appellant's brief. This objection is without merit. If the court has the right to cause the names of the trial jurors to be drawn from the jury box, it has the right to issue to the sheriff of the county its process to require the attendance upon the court of the persons so drawn, and the law requires the sheriff to execute the process and orders of the court. Under the fourth reason of the challenge the appellant contends, we now quote from his brief:

"That said act of 1901 providing for and regulating the selection of jurors is unconstitutional and void, for the reason that the jury commissioners provided for thereby do not, either by election or the method of their appointment, hold any official or representative position as to the people of the county legally authorizing them to act for, and as the representatives of the people of, the county in the matter of selecting citizens and voters of the county for jury service. The legislature has no right or authority to delegate to a given class, the members of a certain

profession, the exclusive right and power to select and
designate a limited number of voters from whom the court
must select the jury commissioners.   In law the people
of a county are all and equally interested in the selection
of jurors to aid, by the exercise of their functions as jur-
ors, in the enforcement and administration of the law,
and under our system of government, based upon the idea
of equal rights, all the voters of a county have equal rights
and privileges in the matter of selecting jurors through
some official occupying towards them, by virtue of their
action in the premises, a representative position or ca-
pacity.   Theoretically all are equally interested in the ad-
ministration of the law, and are entitled to an equal voice
in selecting the instrumentalities of its administration,
and the members of no particular profession, trade or call-
ing can be constitutionally invested with special or ex-
clusive powers in the selection of such instrumentalities.
Under this act the bar of the county recommends four
electors of the county, two of whom are chosen by the court
as the jury commissioners.   This is, in substance, an elec-
tion of the jury commissioners by the bar, for the court is
confined in its choice to the four designated by that body,
and the fact that the bar designates four electors instead
of two does not change the principle involved.   Now, if
the legislature had authority to vest this power of election
or selection in the members of the legal profession of the
county, it must be conceded that it would have equal au-
thority to vest it in the members of any other class, calling,
occupation or condition, as the members of the medical
profession, the ministers of religion as a class, or the min-
isters of any particular religious denomination, or the me-
chanics of the county as a class, or mechanics following
some particular trade, or men engaged in some particular
line of business, as bankers, grocers, clothiers, hotel keep-
ers, or men who are members of secret societies, or of some
particular secret society or order; in short, the different
classes and conditions of men equally entitled with the
lawyers to be invested by the legislature with this power
in the selection of juries through their appointees might

be indefinitely multiplied. Suppose that instead of investing the lawyers with this power the legislature had conferred it upon some other class of citizens, as, for instance, the bankers, the bakers, or the blacksmiths of the different counties of the state, would it not be generally and correctly recognized and contended that the legislature thereby conferred upon that particular class, as a class, powers and privileges not enjoyed by and belonging equally to other citizens of the state? that the law was class legislation and violated the provisions of § 12 of article 1 of the state constitution, which reads: 'No law shall be passed granting to any citizen, class of citizens, or corporation, other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations?'

"There seems to be no good ground for distinguishing in this respect between lawyers as a class and members of any other calling as a class. No class to which the legislature attempted to exclusively delegate the power it has by this act attempted to confer on the legal profession would hold or exercise such power, either by virtue of election or by authorized appointment, that would constitute such class the legal or official representative of the body of the people.

"The power the legislature by this act attempted to confer on the members of the legal profession is in its nature arbitrary and exclusive and in conflict with the fundamental rights of the body of the people, of the underlying principle of constitutional equality, which is one of the essential elements of a representative democracy, such as our government is.

"If, as contended by appellant, the act under consideration is class legislation for the reason that it arbitrarily confers upon a certain class of citizens rights, powers, and privileges and deprives all other citizens and classes of citizens of the same rights, powers, and privileges, and those rights, powers, and privileges are of a public nature and should equally belong to all the voters of the different counties of the state, and said act is therefore unconsti-

tutional and void, it follows that the act is not a law of the
state, and that no jury selected or organized pursuant to
its provisions was a lawful jury, and no verdict of such
a jury is of force or effect and constitutes no warrant for
any judgment or sentence based thereon. . . .

"Hence the jury in the case at bar having been drawn
and organized under the provisions of the jury act of 1901,
if said act is unconstitutional, said trial was a nullity, it
was not in accordance with due process of law, and the
judgment and sentence based thereon should be reversed
and a new trial granted."

Under the constitution of the state, the defendant was
entitled to a trial by an impartial jury of the county in
which the offense was committed. The mode of the selec-
tion of jurors, and their qualification to sit as triers,
limited only by the qualification that they shall be im-
partial, is left to the legislature. An honest and intelligent
juror is more apt to be impartial than a dishonest and ig-
norant one. So far as the act of 1901 aims to secure for
jurors honest and intelligent men, it is in harmony with
that provision of the constitution which guaranties to an
accused person a trial by an impartial jury. There is no
provision in the constitution requiring that the selection
of jurors shall be by officers elected by the people. At-
torneys are sworn officers of the court, admitted as such by
its order, under laws regulating their qualifications and
admission. They were such officers when the constitution
was adopted, and they remain such. They are required to
maintain the respect due courts of justice. They aid the
court, and perform important functions in the administra-
tion of public justice and the enforcement of the law of
the land, and in this respect they differ from the banker,
the baker, and the blacksmith, referred to by appellant's
counsel, who, as citizens, have no such duties to perform.
Under the act, they in no sense appoint the jury commis-

sioners. They nominate, and to that extent are required to aid the court in the selection of such commissioners. No privilege or immunity, within the meaning of the constitution, has been granted to them under the act under consideration. The performance of a duty only has been imposed upon them as officers of the court. Just as if the legislature had imposed the duty of nominating such commissioners upon the clerk of the court and the sheriff. The right given to the members of the bar to simply recommend eligible persons for selection as commissioners is not the conferring of a privilege or immunity upon any citizen or class of citizens, within the meaning of the constitutional prohibition. The privileges and immunities therein referred to pertain alone to those fundamental rights which belong to the citizens of the state by reason of such citizenship. These terms, as they are used in the constitution of the United States, secure in each state to the citizens of all states the right to remove to and carry on business therein; the right, by usual modes, to acquire and hold property, and to protect and defend the same in the law; the rights to the usual remedies to collect debts, and to enforce other personal rights; and the right to be exempt, in property or persons, from taxes or burdens which the property or persons of citizens of some other state are exempt from. Cooley, Constitutional Limitations (6th ed.) 597. By analogy these words as used in the state constitution should receive a like definition and interpretation as that applied to them when interpreting the federal constitution. The right simply of recommendation, which it might be said has been conferred by the act under consideration, and by the order of the court made in accordance with the provisions of that act, is not, in its very nature, such a fundamental right of a citizen that it may be said to come within the prohibition of the constitution,

or to have been had in mind by the framers of that organic law. A statute can be declared unconstitutional only where specific restrictions upon the power of the legislature can be pointed out, and the case shown to come within them, and not upon any general theory that the statute conflicts with a spirit supposed to pervade the constitution, but not expressed in words. *Smith v. Seattle,* 25 Wash. 300 (65 Pac. 612). We think the act, in the respect complained of, is constitutional.

The fifth reason assigned in the challenge is not commented upon in the appellant's brief, and we have not discovered anything in the record sustaining the same.

The third assignment of error is in allowing the state to peremptorily challenge the jurors McBreen and Giblett after the statutory number of peremptory challenges allowed to the state had been exhausted. In relation to these challenges the record shows this: Twelve jurors being in the box, and having been passed for cause by both the state and defendant, the court announced that it was the state's first peremptory challenge. The state exercised its first peremptory challenge. The defendant thereupon exercised two peremptory challenges. The state thereupon exercised a second peremptory challenge. The defendant thereupon exercised a third and fourth peremptory challenge. The state thereupon exercised a third peremptory challenge. The defendant thereupon exercised a fifth and sixth peremptory challenge. Whereupon the following took place: The court announced it was the state's fourth peremptory challenge, whereupon Mr. Harvey, for the state, announced that the state was satisfied with the jury. Counsel for the state being asked by the court if they waived their challenge, replied that they did. Thereupon the court announced that it was the defendant's seventh peremptory challenge. Whereupon the defendant exer-

cised the seventh and eighth peremptory challenges. The following then took place: The court announced that it was the state's fifth peremptory challenge. Whereupon Mr. Harvey, for the state, announced that the state waives its fifth peremptory challenge, whereupon the defendant exercised its ninth and tenth peremptory challenges, and one J. W. Kendall was called as a juror, and passed for cause by both the state and the defendant, and the court announced that it was the state's sixth peremptory challenge, whereupon the state excused J. W. Kendall. Thereupon R. Giblett was called, and having been passed for cause, the court announced that it was the defendant's eleventh peremptory challenge, which was exercised by the defendant. Thereupon Charles E. McBreen was called, and having been passed for cause by both the state and the defendant, the court announced that it was defendant's twelfth and last peremptory challenge. Whereupon Mr. McMurray, for the defendant, announced that the defendant passed the jury. The following then took place: Whereupon the court inquired if the state desired to exercise any more challenges.

"Mr. Harvey: We will excuse Mr. McBreen. Mr. McMurray: Upon what grounds? The court: They have only exercised four of their peremptory challenges, and they have six. Mr. McMurray: They have waived it. The court: The statute provides that their waiving to exercise a challenge does not prevent them from using it. Mr. McMurray: We object to their using it at this time. The court: The objection of counsel is noted and exception allowed. The court: I desire to state that my ruling is that they can only exercise that challenge as to those who have been called into the jury box since they refused to exercise their challenge. They are limited to those jurors who have been called in since they refused to exercise the challenge, and this juror having been called into the box since the time they have exercised any challenge, I hold

that they are permitted to exercise the challenge to this
juror.    Mr. McMurray:    I understand the court to state
that it was their sixth challenge when they challenged Mr.
Kendall.    The court:    It was not a correct statement of
the facts."

Whereupon E. F. Stinson was called as a juror, and
having been passed for cause by both the state and the
defendant, the court announced again that it was the de-
fendant's twelfth and last peremptory challenge.    Where-
upon the defendant exercised that challenge by excusing
Mr. Stinson.    Whereupon W. H. Page was called, and
sworn to answer questions, and having been passed for
cause by both the state and the defendant, the court in-
quired if there were any further challenges.    Whereupon
the state excused Mr. Giblett.    The defendant then ob-
jected to the state excusing this juror, on the ground that
the state, having waived their challenge, should not now be
permitted to exercise it, and the court said:    "Mr. Giblett
having been called into the box since the state passed a
challenge, the challenge will be sustained."    To which ex-
ception was noted by the defendant.    Mr. Giblett was ex-
cused, and another juror called.    Whereupon the court an-
nounced that the state and the defendant having both ex-
ercised the challenges provided by law, the clerk would now
swear the jury to try the case.    Whereupon the jury was
sworn to try the case.    It is contended by appellant that
the court erred in allowing the challenge of the state to
the jurors McBreen and Giblett, claiming that their per-
emptory challenges had been exhausted before the exercise
of these two.

The statute in regard to the right of challenge is as fol-
lows:

"The jurors having been examined as to their qualifica-
tions, first by the plaintiff and then by the defendant, and

passed for cause, the peremptory challenges shall be conducted as follows, towit: The plaintiff may challenge one, and then the defendant may challenge one, and so alternately until the peremptory challenges shall be exhausted. The panel being filled and passed for cause, after said challenge shall have been made by either party, a refusal to challenge by either party in the said order of alternation shall not defeat the adverse party of his full number of challenges, but such refusal on the part of the plaintiff to exercise his challenge in proper turn shall conclude him as to the jurors once accepted by him, and if his right be not exhausted, his further challenges shall be confined, in his proper turn, to talesmen only." § 4987, Bal. Code.

Counsel for appellant in their brief contend that the state waiving at the time the right to use two of the peremptory challenges allowed it exhausted its right to use these challenges. The statute above quoted, in terms, gives the party refusing to exercise his challenge in proper turn the right to use these challenges upon jurors not in the box at the time of such refusal, if his right be not exhausted. The waiver of the right to challenge by the prosecuting attorney when the court announced that it was the state's fourth peremptory challenge and when the court announced that it was the state's fifth peremptory challenge did not exhaust two peremptory challenges to which the state was entitled. The state by waiving these two challenges did not thereby lose the right to exercise them afterwards on jurors not in the box when the challenges were waived. They simply relinquished their right to challenge the jurors then in the box. The situation after the defendant had exercised its fifth and sixth peremptory challenges was that the state was willing to take the twelve men as they were then in the box as the jury to try the case, and the announcement that the state was satisfied with the jury meant that the state was satisfied with the jury as it then

stood, and that they waived their fourth peremptory challenge to the jury as it then stood. At that time, had the defendant's counsel refused to challenge further, under our statute the right of both parties to challenge would have been exhausted, because no new jurymen were called into the box after the waiver of their peremptory challenge. When the state announced that they waived the fourth peremptory challenge, the only reasonable construction that can be placed upon that is that they waived this challenge as to the jurors then in the box, but, if the personnel of that jury then in the box was changed by bringing in new men, then they had a right to exercise these challenges as to the new jurors. It is undoubtedly the intention of the legislature that the defendant and the state should have the right to actually exercise twelve and six peremptory challenges, respectively, and, as nearly as possible, in making said challenges conform to the rule laid down in *State v. Eddon,* 8 Wash. 292 (36 Pac. 139) ; but the manner of exercising these peremptory challenges alternately is no absolute rule of right. That they shall preserve this alternation as far as practicable is all that the statute requires, or this court held in the case of *State v. Eddon, supra.* While, ordinarily, the state is to challenge one peremptorily, then the defense two, and so on, until the challenges are all exhausted, if, by conforming to this rule as far as practicable, the state should happen to have the last peremptory challenge, it would not be error. The statute does not give as a right the last challenge to the defendant. It aims to preserve to the plaintiff the full number of six challenges by providing that the refusal of the plaintiff to exercise his challenge in proper time shall conclude him only as to jurors once accepted by him, and if his right is not exhausted when he refuses to exercise his challenge, his further challenges shall be confined to

jurors that were not in the box when he refused to exercise his challenge, notwithstanding that the defendant may then have exhausted all his peremptory challenges.

Before passing on the remaining errors assigned, it is necessary to make a statement of the facts as disclosed by the evidence. For thirteen or fourteen years prior to the homicide charged in the information, the appellant lived at or near Eatonville, a small hamlet or village in Pierce county, about thirty-four miles from Tacoma. For the last five years of that time he lived in Eatonville, working as a blacksmith and farming. The appellant is a married man, having a wife and two young children. Charles F. Franklin, the person alleged to have been murdered by the defendant, at the time of the homicide was living, and had been living for fourteen years previous thereto, with his family, consisting of his wife and eleven children, on a farm about two miles from Eatonville. Franklin was a man about fifty years of age, the appellant was about fifteen years younger. The appellant and the deceased had lived near together in the same neighborhood in Collin county, in the state of Texas, and were acquainted there. The time of their acquaintance covered a period of about twenty years. Many of their acquaintances around Eatonville testified that the personal relationship between the deceased and the appellant were neighborly and friendly; one witness testifying to this friendship as existing on the 1st day of September, the day before the homicide, when the deceased and the defendant "were talking to one another and joking as usual." Mrs. Franklin, the widow of the deceased, testified that she had been married to the deceased twenty-seven years, and that deceased never liked the appellant. Mr. Van Eaton testified to an intimate acquaintanceship with the deceased and the appellant, and knowledge of their social relations toward each other for

twelve years; that before the public the deceased and the
appellant got along very well, "but both of them cordially
hated the other;" that they expressed it plainly to him;
that two weeks before the homicide the appellant com-
plained to the witness about the deceased interfering in
certain road matters. Mr. Groe testified that once or twice
during the summer the appellant told him that the de-
ceased meddled with some of his matters, and that he
didn't like him. Mr. White testified that he heard the
deceased and the appellant talk unfriendly in regard to
each other. The testimony also discloses that the relation-
ship existing between the deceased and one Herman Ken-
dall at the time of the homicide, and for some time prior
thereto, was not friendly, and during the same time Ken-
dall and the appellant were enemies. The testimony dis-
closes that there was some bitterness of feeling existing
between the appellant and Van Eaton, Groe, Tomlin, and
other principal inhabitants of Eatonville and vicinity,
growing out of his action and position relative to the erec-
tion of a school house and the improvement of roads, and
that they were anxious to get the appellant out of the office
of road supervisor, and to have him removed from Eaton-
ville, and this the appellant had knowledge of. Mrs.
Vance, the wife of the appellant, testified that on the Mon-
day preceding the homicide at Van Eaton's store in Eaton-
ville she had a conversation with Charles Williams, a
nephew of Van Eaton's, and a clerk in his store, in which
Williams said to her: "I see you didn't leave your husband
on Saturday as you intended." She was surprised, and
asked him what he meant. He answered: "Do you mean
to say that Herman Kendall hasn't told you the way your
husband has been carrying on with that girl?" The Wed-
nesday or Thursday following that conversation, at a dance,
Williams, in conversation with her, referred again to the

30—29 Wash.

matter, and said: "It looked as if I would be ashamed to live with him," and wanted to know if she was afraid to leave her husband. That she answered that she did not know. Her husband might go away, and get desperate. Williams answered: "Let him go away;" that was what they wanted. If he didn't, there were three or four of them able to manage him all right. The testimony shows that she left her home without the knowledge of her husband on the Friday following this conversation, and went to her mother's house, about five miles from Eatonville, taking her children with her. That her husband was in Tacoma when she left. That she returned the following Monday to her home, to get some of her things, first stopping at Mrs. Van Eaton's. The appellant came to his house while she was there. That she told him some things she heard. That she did not tell him the conversation with Williams. The court, on the objection of the state, did not permit her to state what the conversation was that took place between her and her husband at the house. She remained about ten or fifteen minutes. When she left, her husband did not act natural. She never saw him as mad before as he was then. She testified that she supposed he was mad, thinking of what trouble people had caused both of them. When she left she went to Mrs. Groe's hotel. This was after 12 o'clock. The appellant testified that in the conversation at the home his wife said something as to a conversation with Williams; that he tried to get her to tell him what Williams had said, but she refused; that she left between 1 and 2 o'clock; that he remained after his wife left about ten minutes, thinking the matter over; that after his wife left, Jimmie Franklin, the deceased's little boy, came to the gate, and said: "Father wants you to come over and shoe a horse for him." He answered: "I don't feel like work today. Tell your father I can't

do the work." After the boy left he thought over the matter, and concluded to go and open his shop, and then hunt Mr. Franklin up, and shoe his horse. He went and opened his shop. After opening his shop, he says he went down to the hotel to look for Mr. Franklin, and he also thought he would probably see his wife. Mr. White, the bartender at the Groe hotel, testified that a few minutes after 2 o'clock of the day of the homicide the appellant came into the bar room of the hotel, called for a drink of brandy, and he gave it to him; that the appellant leaned over the bar, close to the witness, and said: "I'm a widower." He said his wife had left him. He struck down on the bar and said, "By —— I will kill somebody before night." The witness said, "You'd better not, Alex. I wouldn't." The appellant answered: "By —— I will. I will kill some —— before night." Then the appellant struck the bar several times. Then walked towards the door leading from the bar into the main hotel. One of his revolvers fell upon the floor. He kicked it and picked it up, and said: "I have got a —— —— good notion to shoot all the bottles down from behind the bar." He stepped around and made several different threats. Finally he went towards the door again, and said: "—— —— —— sons of ——. I will kill them just as quick as I get in sight." Then he came back, and started towards the north door, and says: "I will shoot the first —— —— son of —— that comes up before me," or something just like that. The words any way, "That runs up against me." "I will shoot the first —— —— son of —— that runs up against me." Then he went out. Charles Williams testifies that he and the deceased were sitting on the porch of Mr. Van Eaton's store. That the appellant came out of the bar room of the hotel, and yelled about as loud as he could,—some of the witnesses say let out a "whoop,"—

and started to walk right over towards the store. That he came right up to the store porch, and said he could lick "any g— d— man in Eatonville." That he "could lick and son —— who stood in with Herman Kendall;" and he said next: "Charley — I can lick you too." That was said to the deceased. The deceased smiled, and said: "I am not looking for a fight, but if you lay those down I will try you a round." The appellant had two revolvers in a holster on a belt around his waist. When the deceased told him to "lay those down," he took the revolvers out, and threw them down on a chair sitting on the porch. The appellant then stepped towards the deceased. The deceased got up. The appellant struck at him twice. Then the deceased struck back. Then the appellant turned, and reached for the revolvers, and got them; the deceased in the meantime apparently advancing to take hold of the appellant with both hands. The appellant turned around and fired. Then the deceased grabbed the appellant, and two more shots were fired immediately, and the deceased forced the appellant backward off the end of the porch, and they fell, the appellant lying underneath the deceased. The witness ran up and grabbed the appellant's hands that the revolvers were in. The appellant made a move, as if to shoot the witness. The witness and a Mr. Potter then grabbed the revolvers, and took them away from the appellant. The witnesses and others after tying the appellant, looked after the deceased, and found that he was shot, and in a few minutes Franklin died from the effects of the wound. The witnesses vary somewhat as to what was said when the appellant came up to the store porch. The variance is not material. Three shots were fired. The evidence disclosed that three cartridges were gone out of the revolvers. The testimony of all the witnesses except the appellant is to the effect that when on the porch the appel-

lant and the deceased arrived opposite to the chair where the revolvers were lying, appellant grabbed for the revolvers, and that Franklin did not, but that the deceased grabbed the appellant's wrist or arms. The appellant testified that both the deceased and himself reached for the revolvers. The statement contains over nine hundred pages of testimony, but we have stated all the main facts. The opening statement as to the nature of the defense is not in the record. It appears, however, from other parts of the record, that the only defense attempted to be made was that the witness Williams tried to shoot Vance, and in such attempt shot and killed the deceased. Evidence in support of this contention was introduced by the appellant. There can be no doubt from the testimony that the appellant fired the fatal shot, and the jury was justified in so finding.

The fourth error assigned is repeated rulings excluding evidence offered by the appellant for the purpose of showing that he had serious and distressing domestic trouble, and the consequent disturbed and abnormal condition of his mind at the time of the homicide, and immediately prior thereto. The fifth error assigned is in repeated rulings excluding evidence offered by the appellant for the purpose of showing that immediately prior to the homicide he had serious and distressing domestic trouble, and thereby showing the condition of his mind at the time of the homicide, the conditions and circumstances by which he was then surrounded, influenced, and actuated, and the true meaning and application of what he said and did immediately before the homicide. We will consider these two assignments together. The following are a sample of the questions objected to on which the evidence was excluded: "Mrs. Vance, did you and your husband or either of you have any difficulty at all in your domestic relations until up about the month of May last?" "On or about the month

of May, 1901, late in the spring of this year did anything happen to cause trouble on your account between you and Mr. Vance?" "I will ask you whether or not it is a fact that during the last two or three months information, reported information, came to you from other people, through Mr. Kendall, that had anything to do with causing trouble between you and Mr. Vance?" "Please relate, Mrs. Vance, what took place between you and your husband when you returned from Mr. Van Eaton's down to your home on the day of the shooting?" "When you went on Friday preceding the shooting what did you do with the children?" "Mr. Vance, I will ask you what if anything occurred about the month of May of this year, if anything did occur to disturb the domestic relations theretofore existing between yourself and your wife?" "What was the condition of affairs existing between you and your wife (on the day of the shooting) at the time she left the house after this conversation?" "Why didn't you feel like work?" Striking out an answer of Vance to a question to the effect "that his wife told him the day of the shooting that she couldn't stand the talk." "What did you want to see her [his wife] for?" "Why did you say to White that you had been left a widower?"

The counsel who prosecutes this appeal for the appellant did not represent him in the court below, and had nothing to do with presenting his case to the jury. The appellant's defense was that he did not kill the deceased, but that Charles Williams fired the fatal shot which took away the life of Charles F. Franklin. The appellant's counsel now claim that under the plea of not guilty any defense can be interposed, whether consistent or not. This is true. But the proper inquiry in the case at bar is not what defense might have been interposed, but what defense was

actually interposed.  How could this testimony be at all relevant or material to the defense that was interposed? Learned counsel for the appellant does not contend that the testimony was pertinent to show that appellant did not fire the fatal shot, or to show that some other person fired the shot.  The trial court, when this class of testimony was first sought to be introduced, excluded it, upon the ground that the appellant's defense was that he did not fire the shot, and for that reason the testimony was not relevant. We think the ruling of the trial court was right.  The court has a right to require of a defendant in a criminal case that he shall point out, when objection is raised to testimony sought to be introduced by him, how and in what manner the evidence is material and relevant.  Nowhere during the progress of the trial was it intimated that the appellant was insane, or that his reason had become temporarily dethroned by reason of his domestic troubles at the time the shot was fired.  This testimony might have been material to show such a state of facts.  But this claim was not put forth by the appellant.  He claimed to be rational and sane, and he went upon the witness stand, and testified to his acts and doings on that day.  The testimony sought to be introduced was not part of the *res gestae*.  The court was not inquiring into the marital troubles of the appellant and his wife. It was sufficiently shown by the evidence that the appellant, a short time before the homicide, was troubled and angered because his wife separated from him. This was all that was necessary.  It was unnecessary to show in detail the cause for the separation, and when the trouble first originated leading up to the separation.  To permit this would be to burden the case with multiplied issues, tending to confuse and mislead the jury.

The sixth error assigned is in giving the following instruction:

"If the intention upon committing a homicide was to take life the killing was done purposely; if the killing was accompanied by circumstances showing a mind fully conscious of its purposes and if before the killing sufficient time had elapsed to enable the mind to have considered the matter and to have formed a design to kill and said design had been formed, the killing was designed and premeditated; even if you should find the malicious purpose and absence of excuse, cause or provocation necessary to constitute murder in the first degree, but should entertain a reasonable doubt as to whether there was any premeditated design to kill, then you should find the defendant guilty of murder in the second degree."

The seventh error assigned is in giving the following instruction:

"In this connection you are instructed that malice as the word is used in defining criminal offenses denotes a criminal act done intentionally without just cause or excuse. The intention is an inference of law resulting from the doing of the act, except in rare instances where the intention is expressly declared by the wrongdoer, and except where the circumstances rebut the presumption of its existence. Malice is presumed where one person deliberately injures another. It is the deliberation with which the act is performed that gives it a malicious character. It is the opposite of an act performed under sudden or uncontrollable passion which prevents the deliberation of cool reflection in forming a purpose. Hence, if in this case you should find that the act charged is not, when committed, accompanied by wrong intent and cool reflection, but was on the contrary the result of sudden and uncontrollable passion produced by adequate cause or provocation, then the defendant would be guilty of no higher degree than manslaughter."

The eighth error assigned is in giving the following instruction:

"The law you will take from the court, but you are the sole judges of the facts in this case. You will determine

the facts from the testimony in the case and render a true verdict upon the facts found by you regardless of all other considerations. While you are the sole judges of the facts, the law has left the penalty to be imposed with the court alone to determine, and this responsibility is with the judge after your verdict has been found. It is your duty only to determine the guilt or innocence of the defendant."

When the court had charged the jury, the appellant took sixteen exceptions to the instructions and refusals to give requested instructions, and caused them to be noted. On the 24th day of October, 1901, the verdict was received, and the jury discharged. On the 13th day of November, 1901, the appellant, through his present attorneys, filed additional exceptions to the instructions, and in these additional exceptions for the first time excepted to the instructions now complained of.

"Exceptions to a charge to a jury, or to a refusal to give as a part of such charge instructions requested in writing, may be taken by any party by stating to the court, after the jury shall have retired to consider of their verdict, *and, if practicable,* before the verdict has been returned, that such party excepts to the same, specifying by numbers of paragraphs or otherwise the parts of the charge excepted to, and the requested instructions the refusal to give which is excepted to; whereupon the judge shall note the exceptions in the minutes of the trial, or cause the stenographer (if one is in attendance) so to note the same." § 5053, Bal. Code.

The object of the statutory provisions is that, by compelling counsel for the accused to take their exceptions after the jury has retired, and while they are deliberating, the attention of the trial court may be called to the objections and exceptions made by counsel to the instructions given to the jury, and an opportunity be given of recalling the jury, and correcting any errors which may have been made. If the practice now insisted upon in this case is to pre-

vail, not only would the trial judge have no opportunity of correcting any misstatements of the law which he may make to the jury, but opportunities would be given to counsel for accused persons to urge on appeal many important questions which the trial court had never been called upon to determine. This is not the policy of the law. The courts uniformly hold that, where the statutes provide that an exception to the giving or refusing of an instruction is to be taken after the jury retire, and before the verdict is rendered, an exception taken, or attempted to be taken, later is unavailable on appeal. But appellant contends that it was not practicable to take the exceptions at the time the sixteen exceptions were taken and noted, and that the statute contemplates that in such a case they may be taken afterwards. The record discloses to us that it was practicable to have taken these exceptions after the jury retired. All that was incumbent upon the appellant's attorneys to do after the jury had retired, and before the rendition of the verdict, was simply to state to the court that they excepted to the instructions just as they did in the other sixteen instances, or, if there was not sufficient time before the rendition of the verdict they should have asked the court to extend the time to take their exceptions. Under the circumstances of this case, the affidavit of one of the attorneys who conducted the trial below, to the effect that it was not practicable to examine and consider intelligently the instructions, will not be considered in face of the record. We will not pass upon these assignments, or critically examine them, further than to say that we perceive no prejudicial error in the instructions when taken in consideration with the other instructions and the facts in the case.

The ninth assignment of error is the refusal of the court to give instructions Nos. 4, 5, 6, 8, 11, 13, 15, 16,

17, 21, 22, 23, 25, 26, 30. The only errors contended for by the appellant in his brief is the refusal to give instructions Nos. 5, 6, 11, and 30. Refusal to give instructions 5 and 6 requested by defendant was not error. Instruction No. 5 requested by defendant is as follows:

"A mutual combat is where two persons upon a sudden quarrel, mutually and upon equal terms, whether with or without weapons, enter into a fight, and in such case, if one be killed, the crime is only manslaughter, no matter who provoked the fight or who struck the first blow."

While this instruction may state correctly an abstract proposition of law, the evidence in this case does not justify the giving of this instruction. It presumes that the killing was done in a sudden quarrel, which was commenced and ended by two persons *on equal terms*. This instruction might have misled the jury, in view of the testimony. This instruction, in any event, is covered by the court's instruction defining manslaughter, hereafter referred to. Instruction No. 6 requested by the defendant was as follows:

"If it appears from the evidence in this case that the defendant and the deceased entered into a mutual combat, and at the commencement of the fight attacked each other on equal terms, and on a sudden, without previous intention to kill the deceased the defendant in the course of the fight, in the heat of passion, snatched up a deadly weapon and killed the deceased, it is only manslaughter and your verdict should be such."

The following instruction was given by the court:

"If it appears from the evidence in this case, that the defendant and the deceased entered into a mutual combat, and at the commencement of the fight attacked each other on equal terms, and on a sudden, without previous intention to kill the deceased, the defendant, in the course of the fight and in the heat of passion, snatched up a deadly weapon and killed the deceased, it is only manslaughter,

but if you believe from the testimony beyond a reasonable doubt, that the defendant in the course of the fight snatched up the deadly weapons and purposely and of his deliberate and premeditated malice killed the deceased, then he would be guilty of murder in the first degree; or if from the evidence you are satisfied beyond a reasonable doubt, that in the course of the fight the defendant snatched up the deadly weapon and purposely and maliciously, but without deliberation and premeditation, killed the deceased, then he would be guilty of murder in the second degree."

In this instruction the court again correctly defines the different degrees of murder, and tells the jury what degree a person would be guilty of under certain circumstances, and this instruction covers appellant's requests 5 and 6.

Instruction No. 11 requested by defendant is as follows:

"Should the jury believe from the evidence that Charles Franklin died from a mortal wound inflicted by a gunshot, and if the jury further find that some other person than the defendant had the same opportunity to fire the shot that inflicted said mortal wound, and that all the circumstances of the affray point as clearly to some other person as having fired the fatal shot as the defendant, then these facts are sufficient to raise a reasonable doubt in the mind of the jury as to the guilt of the defendant and the jury should acquit him."

The refusal of the court to give this instruction was not excepted to by the defendant until after the trial, and for the reasons hereinbefore stated this assignment of error should not now be considered. This instruction is open to the criticism that it is a comment upon the testimony. The jury in this instruction are not told that if they should find that some other person than the defendant had the same opportunity to fire the shot that inflicted the said mortal wound, and that all the circumstances of the affray point as clearly to some other person as having fired the

fatal shot as to the defendant, that they might take these facts and circumstances into consideration in arriving at their verdict, or in arriving at whether or not it has been shown beyond a reasonable doubt that the defendant fired the fatal shot; but they are told that these facts, if found by them, are sufficient to raise a reasonable doubt; the instruction being, in effect, to tell the jury what facts would raise a reasonable doubt, and is clearly erroneous, and no error was committed in refusing to give it.

Instruction No. 22 requested by defendant reads as follows:

"If there is a reasonable doubt whether the defendant fired the fatal shot that inflicted the mortal wound of which Charles Franklin died, but that it may have been fired by another person than the defendant, then the defendant should be acquitted."

Instruction No. 30 requested by the defendant reads as follows:

"Although the jury may believe from the evidence that Charles Franklin was killed at the time and in the manner mentioned in the information, and that the shot that caused his death was fired by Charles Williams or by the defendant, still, if the jury are unable from the evidence to determine by which of said persons the shot was fired, then the jury should consider the case precisely the same as though it had been proved that some other person than the defendant fired the fatal shot. The jury are instructed that if they find from a consideration of all the evidence that it pointed as clearly to Charles Williams as the person who fired the fatal shot as it does to the defendant, or if after a fair and full consideration of all the evidence the jury entertain a reasonable doubt as to whether the said Charles Williams, or the defendant, fired the shot that killed the deceased party, then the jury should acquit the defendant."

It was not error to refuse either of these instructions, because they had been covered fully by other instructions given by the court. The different degrees of murder were fully explained to the jury in the instructions. The jury were also fully instructed that before they could find the defendant guilty, they must be satisfied beyond a reasonable doubt from all the evidence of his guilt, and the court in one of its instructions said:

"The law presumes the defendant innocent of the crime of which he is charged, or any other crime, until he is proven guilty. The burden of proof in every material allegation of the information, as herein charged, is upon the state, and it must establish the defendant's guilt beyond every reasonable doubt. Mere probability of defendant's guilt is not sufficient."

Then again, in another instruction given by the court, the jury is told that, unless they are satisfied beyond a reasonable doubt of the defendant's guilt, they must acquit the defendant; and the court further instructed the jury as follows:

"You will pay no attention to the statements of counsel except in as far as they are borne out and supported by the evidence. If you have such a doubt as I have before explained to you, a reasonable doubt based upon the evidence or the lack of evidence, as to the guilt of the defendant of the crime charged, or as to whether under all the circumstances defendant acted in self defense, or as to whether defendant fired the shot that killed deceased, then you should acquit him, but if you have an abiding conviction of the truth of the charge, then you should convict."

It will be noticed that in this instruction the jury are told that if they have any reasonable doubt as to whether defendant fired the shot that killed the deceased, then they should acquit the defendant.

In *State v. Carey,* 15 Wash. 553 (46 Pac. 1051), this court uses the following language:

"It is urged that the court committed error in refusing to instruct the jury as requested by the defendant upon the subject of the *corpus delicti*. Counsel argues that there was evidence tending to show that death was occasioned by a severe fall which the deceased had sustained on the night in question, and not by the means charged in the information, and that it was defendant's right to have the jury instructed upon any theory of the case having evidence in its support. Conceding the fact and the law to be as contended for by counsel, we think that no error was committed in refusing the particular instruction requested, because the subject matter was included in and covered by the general charge in which the jury were told that if it was 'possible to account for the death of the deceased upon any reasonable hypothesis other than that of guilt of the defendant,' then it became their duty to so account for and find the defendant not guilty. Also, that, 'if the jury entertained any reasonable doubt upon any single fact or element necessary to constitute the offense,' it was their duty to acquit him."

In the case at bar the appellant argues that there was testimony tending to show that Charles Williams, or some other person than defendant, fired the shot that caused Franklin's death, and that the instructions numbers 22 and 30 requested by defendant should have been given to support this theory; but this refusal was not error, under *State v. Carey, supra*, because the subject matter was included in and covered by the general charge given by the court, and also in other instructions requested by the appellant and given by the court as follows:

"That in cases and trials of this kind the jury must not weigh the testimony and decide upon a mere preponderance thereof, or the number of witnesses, but it is your positive and solemn duty to consider the whole evidence in the case with all the attending circumstances before them, and in so doing, if they entertain a reasonable doubt arising from the evidence, or want of evidence, as to any material

fact, as to the guilt of the defendant, either as to murder in the first or second degree, or manslaughter, it is their duty to acquit."

"The court instructs the jury, that in this case, the law raises no presumption against the defendant, but every presumption of the law is in favor of his innocence; and in order to convict him of the crime alleged in the information, or of any lesser crime included in it, every material fact necessary to constitute such crime, must be proved beyond a reasonable doubt, and if the jury entertain any reasonable doubt upon any single fact or element, necessary to constitute the crime, it is their duty to give the prisoner the benefit of such doubt and acquit him."

"It is incumbent on the prosecution to prove every allegation of the information, as therein charged. Nothing is to be presumed or taken by implication against the defendant."

"The jury are instructed as a matter of law, that where a conviction is sought in a criminal cause, the state must not only show a preponderance of evidence that the alleged facts and circumstances are true, but they must be such facts and circumstances as are absolutely incompatible upon every reasonable hypothesis with the innocence of the accused, and incapable of explanation upon any reasonable hypothesis other than the guilt of the defendant, and in this case, if all the facts and circumstances relied on by the state for conviction can be reasonably accounted for upon any theory consistent with the innocence of the defendant, then, the jury should acquit him."

The instructions given by the court fully cover the matters contained in requests 22 and 30, and for that reason there was no error in refusing them, it being a well established rule of law in this state that it will not be error to refuse requests for instructions that have been covered by the instructions given by the court. The instructions given by the court, taken as a whole, fairly stated the law to the jury on the facts disclosed by the testimony, and we cannot discover, after a critical examination of the entire charge, any substantial or prejudicial error.

The tenth error assigned is in overruling and denying appellant's amended motion for a new trial. The motion is on the grounds of newly discovered evidence; error of law occurring at the trial and excepted to; and because the verdict is contrary to the law and the evidence. Lena Tudson and Alice McCabe make an affidavit, in which they state that at the time of the homicide they were working as employees in Groe's hotel at Eatonville; that the kitchen in the hotel is a room in the saloon building immediately adjoining the bar room, being divided from the bar room by a light and thin partition of cedar shakes, the joints of which are not closely matched; that this partition constitutes an indifferent obstruction to the transmission of sound between the bar room and the kitchen; and that a conversation carried on in the bar room in an ordinary conversational tone is clearly and distinctly audible in the kitchen; that affiants were familiar with the voice of appellant, which was habitually loud, and clear and positive; that they were in the kitchen when the appellant entered the bar room on September 2, 1901, just before the homicide, and remained there all the time; that they *verily believed* they heard and understood all that was then said by the appellant; and that if appellant said anything that was not heard by them, it must have been in a lower tone of voice, and much lower than appellant's usual tone of voice. They further say:

"That during the time defendant was in said bar room as aforesaid, although his voice was clear and distinct, and clearly and distinctly heard by affiants, it was not noisy, aggressive, violent or boisterous, that he did not then or there indulge in any filthy, beastly or obscene expressions; that defendant did not then or there state or threaten that he would shoot, kill, or in any way harm or injure anyone, or that it was his purpose, desire, or intention to shoot, kill, or in any way harm or injure any one.

That the only improper statements or expressions at that
time made or indulged in by the defendant were some pro-
fane expressions not noticeably differing from those used
by a large percentage of the visitors, and frequenters of
said bar room. That whilst defendant was then in said
bar room affiants did not hear any noise therein as of a
pistol, revolver, or any similar object, or of any object at
all, either falling to or being thrown to the floor, or be-
ing kicked or tossed about upon the floor of said bar room,
and aver that if any such occurrence then and there took
place they could and would have heard the same.

"Affiants further aver that, as far as they could and
did understand from what they heard said, and stated
by defendant in said bar room at the time in question,
his conduct at that time was not unusual or exceptional
and did not in any material respect substantially differ
from that of the average frequenter of said place.

"Affiants further aver that by reason of their inexperi-
ence in litigation of any kind they were unaware of the
fact that their testimony above outlined and set forth
would or could be material or relevant in said case, and
that they therefore did not at any time before the trial
of said case advise or inform any one in any way connected
with the defense thereof of their knowledge of said facts
or what their testimony would be if they were called to tes-
tify in said case. And affiants further aver that they are
not in any way related to defendant and, beyond a desire
to see exact justice done in conformity with the exact facts
of the case, they are entirely disinterested in the premises,
and that if called as witnesses in said case their evidence
will be substantially as hereinbefore set forth."

The affidavit of S. F. McAnally is to the effect:

"That on or about September 3, 1901, affiant was re-
tained by said defendant as his attorney in said case, and
that he was the only attorney in any way retained or em-
ployed in said case on defendant's behalf until on or
about October 7, 1901, upon which latter date J. L. Mc-
Murray, Esq., was employed as an attorney therein on
behalf of defendant to assist affiant in the trial thereof,

and the preparation immediately incident to said trial, which trial began October 14, 1901.

"That the services of said McMurray in said case consisted in examining the law pertaining to said case, the preparation of instructions to the jury to be requested on behalf of defendant, and participation in the trial and argument of the case.

"That, excepting said McMurray, the affiant was the only attorney engaged by, or working in the interest of, defendant during the pendency of said case or its trial. That said Eatonville where said homicide occurred is thirty-four miles distant from the city of Tacoma, which is the county seat of said county, the place of residence of affiant and the place where the trial of said action occurred. That at all times since the date of said homicide until said trial of defendant therefor, the means of travel between said city of Tacoma and Eatonville was either by private conveyance or by electric car to Spanaway, ten miles distant from Tacoma, and thence to Eatonville by stage, a distance of twenty-four miles, or by Tacoma Eastern Railway to Waldron, and thence by stage eighteen miles. That between the date of said homicide and the trial of said cause affiant went five different times from said city of Tacoma to Eatonville on business connected with said cause and the trial thereof and for the purpose of ascertaining as fully, completely, and thoroughly as possible all the facts in said case, as well as all the collateral facts and circumstances having any relevancy thereto, and all the witnesses for the defense and the facts, circumstances, and conditions bearing on said cause and the defense therein, and within their knowledge. That on each of the five different occasions that affiant so visited Eatonville in connection with said case as aforesaid he spent from two to five days at Eatonville, and in its vicinity, investigating said cause and in interviewing and conversing with everyone who affiant supposed might have any knowledge or information regarding the facts of said cause, or collateral facts bearing thereon, for the purpose of acquainting himself as fully as possible with such

facts as a preparation for properly and intelligently defending said action upon the trial thereof.

"That affiant traveled more than 600 miles by various modes of travel, and as he verily believes interviewed more than 100 persons, in preparing for the defense of said action. That defendant is a poor man, with very limited means, has been confined in prison ever since said homicide, and has been unable to render any substantial or material assistance in the matter of preparing his defense in said action. That during all the times between the date of said homicide and defendant's trial therefor, affiant used his best efforts and exercised all possible diligence on his part to fully and properly prepare for the defense of said action on the trial thereof. That it appears from the evidence introduced on the trial of said cause that the homicide in question occurred at or about two o'clock in the afternoon of September 2, 1901, immediately in front of a store then owned and conducted by one Van Eaton, at said town of Eatonville. That on said September 2, 1901, one Groe was running a hotel at said Eatonville, which hotel was about 200 feet from said store, and in connection with said hotel a bar room or saloon, which saloon was in a building immediately adjoining said hotel and constituting an annex thereto.

"That upon the trial of said action the following named witnesses, to-wit: E. R. White, T. C. Van Eaton, Lydia Manchester, testified for the prosecution and against the defendant, substantially as follows, to-wit:

"That immediately before the said homicide the defendant entered said room or bar room and remained there about ten minutes; that whilst then in said bar room defendant indulged in extremely violent, abusive, obscene, and profane language, and spoke during all the time he was then in said bar room in a very loud tone of voice, and that during all the time he was then and there in said bar room that his conduct was noisy, offensive, rough, and boisterous. That he dropped or threw upon the floor a revolver that he had in a belt strapped around his waist; that upon said revolver striking the floor he kicked said revolver around

the floor of the bar room, and then declared in a very loud and threatening voice that he would kill the first man that crossed his path, or stood up against him, or words to that effect. Affiant further deposes and says that the prosecution, upon the argument and submission of said case to the jury, laid great stress upon and attached great importance to said testimony, and especially to that certain portion thereof relating to said alleged threat, as proving that the homicide in question was committed by defendant pursuant to a homicidal intent, existing in defendant's mind at the time said witnesses testified that he made said threat; and affiant further says he believes said testimony, and the argument of counsel for the prosecution based thereon, exercised a strong and dominating influence on the minds of the jury in rendering the verdict of murder in the first degree in said case.

"Affiant further deposes and says that the kitchen of said hotel is immediately in the rear of and adjoining said bar room, and separated therefrom only by a very light partition, made of the material known as cedar shakes and which consists of thin strips of cedar timber split from the log by hand; that, like all cedar shakes or strips of which this partition are made are not exactly true either on the edges or sides, but vary in and out from a true line more or less according to the grain of the log from which they are split, and that the joints between said strips are therefore loose and open. That said strips or shakes are thin and the cedar timber out of which they are made is very light and porous, and that by reason of said strips being so thin and imperfect and said cedar tree so light and porous as aforesaid, said partition constitutes but a very slight and indifferent obstruction to the transmission of sound from said bar room to said kitchen, and that said obstruction is so slight that a conversation carried on in said bar room in an ordinary conversational tone can be distinctly heard and understood in said kitchen. . . . Affiant further deposes and says that since the close of the trial of said action and the return of the verdict therein, and for the first time that he ever

heard or learned the same, he has learned that at and during all the time immediately preceding the homicide here in question the defendant was in said bar room as hereinbefore referred to, and during which time said witnesses hereinbefore named testified that said defendant indulged in said loud, obscene, and profane language, and noisy and boisterous conduct, and made said threat, there were in said kitchen adjoining said bar room two persons, to-wit: One Lena Tudsen, aged 19 years, and one Alice McCabe, aged 17 years, who were then employed in said hotel, and who are now living in the city of Tacoma, Pierce county, Washington.   .   .   .

"Affiant further deposes and says that, notwithstanding his best and most earnest efforts and diligence as aforesaid to secure all important available evidence on defendant's behalf for use on said trial of said action, he never before said trial knew or learned from any source or any person that either said Lena Tudsen or Alice McCabe were present at the time of said bar room conversation, or had any knowledge of said case or any facts bearing thereon or in any way relating thereto or connected therewith, and he further avers that to the best of his knowledge, information, and belief no friend of the defendant or any person interested in his defense had any knowledge or information regarding the testimony that, if known, could and would be given on the trial of said case by said Lena Tudsen and Alice McCabe. That as affiant is now informed said Lena Tudsen and Alice McCabe remained at Eatonville about three weeks after the time of said homicide, but were during all of said time employed in said hotel, and that said witness Groe, his wife, and bartender, the witness White, all testified adversely to defendant on the trial of said case, and were during the pendency of said trial as well as throughout the same unfriendly in their attitude towards defendant, and, if they or either of them knew how said Lena Tudsen and Alice McCabe would testify if witnesses in said case, they failed and neglected to disclose the same either to affiant or to any friend of defendant, although they well knew during all of said time that affiant was defendant's attorney in said case."

The witness, White, whose testimony we have quoted in the statement, was corroborated by Miss Manchester, a school teacher, who was near the door of the hotel, and Mr. Van Eaton, the post master, who was near the same place, as to the loud, boisterous, and vile talk and threatening language used by appellant in the bar room just before the homicide. It may be conceded that, under the circumstances, the evidence of Lena Tudsen and Alice McCabe was material for the defense, but that is not sufficient to warrant the granting of a new trial. The law further requires that the evidence could not with reasonable diligence *have been discovered* and produced at the trial.

Mr. Vance testified that he believed White knew his (Vance's) wife was in the hotel, because White went back and forth into the kitchen, and he knew the situation of the kitchen. Mrs. Vance testified that *she went to Mrs. Groe* at the hotel, and was there when she heard the shots. Mrs. Kendall, a witness for the appellant, and a sister of Mrs. Vance, was at Groe's hotel at the time the homicide occurred. Mrs. Groe on rebuttal testified that she heard conversation in the bar room at about the time Vance was there, but on objections of the appellant she was not allowed to state its character, and that it was loud. The nature of the partition between the bar room and kitchen and the surroundings of the hotel were apparent to Mr. McAnally when he went to Eatonville five times to examine into the evidence and ascertain the facts. On each occasion he spent from two to five days at Eatonville investigating. He interviewed over one hundred persons, but never interviewed the servants about the hotel, or the witnesses who were there, as to the other persons about the hotel; at least, this is not shown by his affidavit. The two girls were there employed in the hotel for three weeks after the homicide. There was nothing to prevent the

appellant's attorney from interviewing them. The law requires the utmost diligence to be used by the defendant and his counsel, and by those connected with and interested in the defense of the case. We think that the provision of the statute with reference to the exercise of due diligence has not been complied with by the appellant or his counsel in this case. *State v. Power,* 24 Wash. 34 (63 Pac. 1112). In that case we said:

"It is next objected that the court erred in refusing to grant the appellant's motion for a new trial. This motion was based on the ground of newly discovered evidence. This consists of the statement, shown by the affidavit of a nurse, to the effect that the deceased immediately preceding her death, had made declarations to the nurse tending to exonerate the appellant. It appears from the record that the nurse was employed to wait upon the deceased by the defendant himself; and, while he states in his affidavit that he had no knowledge at the time of the trial that she would testify that the deceased had made these declarations, it would be too much to say that he could not, by reasonable diligence, have discovered that fact. He was at all times, prior to his conviction, at liberty on bail, and had every opportunity to prepare for his defense. He knew the whereabouts of the nurse, yet it appears that she was never questioned as to her knowledge concerning the matters that would be subject to inquiry at the trial. This was not the exercise of that reasonable diligence which the Code requires as a prerequisite to the granting of a new trial on this ground."

This statement of law is peculiarly applicable to the facts in the case at bar. While the appellant was confined in jail, he had the assistance of two lawyers as his counsel, and his wife was aiding and assisting him in the preparation of his defense, and it is too much to say that this evidence could not have been discovered and produced at the trial by the exercise of that diligence which the law

requires. The appellant's wife must have known who was in the kitchen of Groe's hotel on the day of the tragedy. Mrs. Groe certainly knew, and if the appellant's counsel had used the diligence that we have referred to in the preparation of their case for trial, and had deemed the testimony of these witnesses material, and important for the appellant's defense, such evidence could have been produced before the jury in this case. The matter of granting a new trial is within the discretion of the trial court, and the presumption is that the trial court, in denying a new trial on the ground of newly discovered evidence, properly exercised his discretion. We think this evidence could have been discovered, if the attorney of the appellant had investigated and interviewed the persons who were in and about Groe's hotel on the day of the homicide. That prudence and ordinary experience would suggest the interviewing of such persons for the facts connected with the presence of the appellant at the hotel. There is no showing that this was done. Reasonable diligence has not been shown to discover the evidence of the two girls.

The eleventh error assigned is in overruling defendant's motion in arrest of judgment, and the twelfth is in rendering judgment on the verdict because contrary to law and against the evidence. The threats made by the defendant in the bar room, as testified to by Mr. White, were admitted in evidence without objection. They were properly admitted, to show general malice, and a purpose to kill or injure some one. *State v. Larkins* (Idaho), 47 Pac. 945; *Benedict v. State,* 14 Wis. 423; *Brooks v. Commonwealth,* 100 Ky. 194 (37 S. W. 1043); *State v. Hymer,* 15 Nev. 49. The appellant had murder in his heart. From the conduct of the appellant, the jury might well believe that the remark of the deceased to the appellant when he came

up to the porch, "I thought you were sick, Alex.," turned the anger of the appellant to the deceased, and that the appellant then made up his mind to provoke a quarrel with the deceased, irrespective of consequences. He immediately declares that he can lick any "g— d— man in Eatonville." He can lick any "s— of a b— who stood in with Herman Kendall." "Charlie, [meaning the deceased] g— d— you, I can lick you." What happens? Mr. Franklin smiled, and said, "I am not looking for a fight, but if you will lay your revolvers down I will try you a round." Does he lay off his revolvers where they cannot be reached? No. He takes particular pains to lay off his revolvers on a chair, between which chair and the deceased he took great pains to keep himself. Having a right to believe that a blow would be returned if made, after laying off the two revolvers, he approaches Mr. Franklin, and makes two strikes at him. Mr. Franklin rises, and attempts to push him back. He goes back until opposite the chair where the two revolvers are lying. He immediately grabs them, and commences shooting, as the jury might well believe, with deliberate and premeditated malice. The result of that shooting is the killing of an old and defenseless man, without any cause or provocation.

The ends of justice do not require us to disturb the findings of the jury in this case. The judgment of the court below on the verdict ought to be, and the same is, affirmed.

REAVIS, C. J., and MOUNT, ANDERS, DUNBAR and HADLEY, JJ., concur.