**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| INTERNATIONAL FRANCHISE ASSOCIATION, INC.; CHARLES STEMPLER; KATHERINE LYONS; MARK LYONS; MICHAEL PARK; RONALD OH, *Plaintiffs-Appellants*, | No. 15-35209 D.C. No. 2:14-cv-00848-RAJ |
| v. | |
| CITY OF SEATTLE, a Municipal Corporation; FRED PODESTA, Director of the Department of Finance and Administrative Services, *Defendants-Appellees*. | OPINION |

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted
September 1, 2015—Seattle, Washington

Filed September 25, 2015

Before: Michael Daly Hawkins, Ronald M. Gould,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Hawkins

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's denial of a preliminary injunction which the International Franchise Association sought in order to prevent the City of Seattle from enforcing a provision, in its recently enacted minimum wage ordinance, that classifies certain franchisees as large employers, subjecting them as a result to a steeper schedule of incremental wage increases over the next five years.

The panel held that IFA did not show that it was likely to succeed on the merits or that a preliminary injunction was in the public interest. Rejecting IFA's claims that the Seattle ordinance violated the dormant Commerce Clause, the panel determined that there was insufficient evidence of a burden on interstate commerce. Rejecting IFA's claim brought under the Equal Protection Clause, the panel held that the district court did not err in finding a legitimate purpose in the classification and a rational relationship between franchisees and their classification as large employers. The panel further rejected IFA's First Amendment challenge after determining that the Seattle ordinance was not motivated by a desire to suppress speech, the conduct at issue was not franchisee expression, and the ordinance did not have the effect of targeting expressive activity. The panel also held that ordinance was not preempted by the Lanham Act and did not violate the Washington state constitution.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

In evaluating whether IFA would suffer irreparable harm, the panel held that the chain of events suggested by IFA was speculation that did not rise beyond the mere possibility of harm. The panel further held that IFA did not provide persuasive evidence showing that the public interest would suffer as a result of allowing the ordinance to take effect, failed to raise serious questions going to the merits of any of its claim, and failed to show that an injunction was in the public interest.

## COUNSEL

Paul D. Clement (argued), Viet D. Dinh and H. Christopher Bartolomucci, Bancroft PLLC, Washington, D.C., for Plaintiffs-Appellants.

Peter S. Holmes, Seattle City Attorney, Gregory C. Narver (argued), Gary T. Smith, John B. Schochet, Assistant City Attorneys, Seattle City Attorney's Office, Seattle, Washington; Parker C. Folse, III, Edgar G. Sargent, Justin A. Nelson, Drew D. Hansen, E. Lindsay Calkins, Susman Godfrey LLP, Seattle, Washington, for Defendants-Appellees.

Kate Comerford Todd, Steven P. Lehotsky, United States Chamber Litigation Center, Inc., Washington, D.C., for Amicus Curiae the Chamber of Commerce of the United States of America.

William S. Consovoy, Thomas R. McCarthy, J. Michael Connolly, Consovoy McCarthy PLLC, Arlington, Virginia, for Amici Curiae American Hotel & Lodging Association, Asian American Hotels Owners Association, Home Care Association of America and Washington Retail Association.

Angelo I. Amador, Regulatory Counsel, National Restaurant Association, Washington, D.C., for Amicus Curiae the National Restaurant Association.

Ronald A. Fein, Free Speech For People, Newton, Massachusetts; Brenda Wright, Adam, Lioz and Naila Awan, Dēmos, New York, New York, for Amici Curiae Free Speech for People, Dēmos, Courage Campaign, and Equal Justice Society.

Rebecca Smith, National Employment Law Project, Seattle, Washington; Paul K. Sonn, National Employment Law Project, New York, New York, for Amicus Curiae National Employment Law Project.

Michael Rubin, Stacey M. Leyton (argued), Eric Brown, Altshuler Berzon LLP, San Francisco, California; Dmitri Iglitzin, Schwerin Campbell Barnard Iglitzin & Lavitt LLP, Seattle, Washington, for Amici Curiae SEIU Healthcare, 775NW, SEIU Healthcare1199NW, SEIU Local 6, OPEIU Local 8, UFCW Local 21, OneAmerica, Working Washington, Martina Phelps, and Crystal Thompson.

Robert W. Ferguson, Attorney General, Alan D. Copsey and Jay D. Geck, Deputy Solicitors General, Office of the Attorney General, Olympia, Washington, for Amicus Curiae State of Washington.

John R. Lopez, IV, Solicitor General, Dominic E. Draye and Jennifer M. Perkins, Office of the Attorney General, Phoenix, Arizona, for Amicus Curiae State of Arizona.

**OPINION**

HAWKINS, Circuit Judge:

The International Franchise Association ("IFA") appeals the denial of a preliminary injunction which IFA sought in order to prevent the City of Seattle ("City") from enforcing a provision in its recently enacted minimum wage ordinance. The provision classifies certain franchisees as large employers, subjecting them as a result to a steeper schedule of incremental wage increases over the next five years. While we express no view as to the ultimate merits, we affirm because IFA did not, at this stage in the proceeding, show it is likely to succeed on the merits or that a preliminary injunction is in the public interest.

**FACTUAL AND PROCEDURAL BACKGROUND**

Shortly after taking office, Seattle Mayor Ed Murray assembled an Income Inequality Advisory Committee ("IIAC") tasked with making recommendations "on how best to increase the minimum wage in Seattle." The IIAC consisted of twenty-four members and included representatives from the business community and labor unions. Following a series of meetings and public engagement forums, the IIAC recommended enacting staged increases in the minimum wage, with smaller businesses subject to a more gradual schedule, recognizing that they "would face particular challenges in implementing a higher minimum wage." Though the IIAC debated whether to classify franchisees as large employers, it did not recommend doing so.

Based on the IIAC recommendation, the Mayor's Office drafted a proposed ordinance that would raise the minimum wage to $15 per hour in stages according to two schedules—one for businesses with 500 or more employees ("Schedule One Employers") and the second for businesses with fewer than 500 employees ("Schedule Two Employers"). The draft ordinance classified franchisees associated with a franchisor and/or network of franchisees employing more than 500 employees nationwide as Schedule One employers, regardless of the number of persons employed by the particular franchisee or the number of persons employed in Seattle.

The City Council unanimously passed the ordinance on June 2, 2014, and the Mayor signed it into law the next day. The ordinance raises the minimum wage in stages according to two schedules for large and small employers, Ord. §§ 4, 5, and classifies franchisees affiliated with large networks as large employers, *id.* § 2(T) (definition of large employer). The ordinance defines a franchise as:

> A written agreement by which: (1) A person is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan prescribed or suggested in substantial part by the grantor or its affiliate; (2) The operation of the business is substantially associated with a trademark, service mark, trade name, advertising, or other commercial symbol; designating, owned by, or licensed by the grantor or its affiliate; and

(3) The person pays, agrees to pay, or is required to pay, directly or indirectly, a franchise fee.

Ord. § 2(I).

The incremental increases for each schedule are as follows:

| Effective Date | Schedule One | Schedule Two | Δ |
|---|---|---|---|
| Apr. 1, 2015 | $11 | $10 | 10% |
| Jan. 1, 2016 | $13 | $10.50 | 24% |
| Jan. 1, 2017 | $15 | $11 | 36% |
| Jan. 1, 2018 | $15 | $11.50 | 30% |
| Jan. 1, 2019 | $15 | $12 | 25% |
| Jan. 1, 2020 | $15 | $13.50 | 11% |
| Jan. 1, 2021 | $15 | $15 | 0% |

IFA filed suit in district court, seeking a preliminary injunction that would require Seattle to classify certain franchisees as small employers. It did not challenge the City's authority to raise the minimum wage generally or to differentiate between large and small employers, nor does it do so on appeal. IFA alleged that the franchisee classification violated the Commerce Clause, Equal Protection Clause, First

Amendment, and the Washington State Constitution, and was preempted by the Lanham Act and ERISA.[1]

After hearing argument, the district court denied IFA's motion for preliminary injunction, finding that it did not show a likelihood of succeeding on the merits of its various claims. *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 2015 WL 1221490, at \*5–23 (W.D. Wash. Mar. 17, 2015). The district court also concluded that the remaining preliminary injunction factors disfavor granting a preliminary injunction. *Id.* at \*24–25.

Judgment was entered March 17, 2015. IFA filed a timely notice of appeal on March 20, 2015.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction to review the denial of a motion for a preliminary injunction under 28 U.S.C. § 1292(a)(1). Denial of a motion for a preliminary injunction is reviewed for abuse of discretion and the underlying legal principles de novo. *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011). The court does not review the underlying merits of the case, but rather whether the district court relied on an erroneous legal premise or abused its discretion in denying IFA's motion for preliminary injunctive relief. *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 468 (9th Cir. 2010). In making this determination, the court considers "'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *DISH Network Corp.*, 653 F.3d at 776 (quoting *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982)).

---

[1] IFA does not raise the ERISA claim on appeal.

## ANALYSIS

To obtain a preliminary injunction, IFA was required to show (1) it is likely to succeed on the merits of its claim, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of hardships tips in its favor, and (4) a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## I. Dormant Commerce Clause

"Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984). Modern dormant Commerce Clause jurisprudence primarily "is driven by concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74 (1988)).

"A critical requirement for proving a violation of the dormant Commerce Clause is that there must be a *substantial burden* on *interstate commerce*." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012) (citing *South-Central Timber Dev.*, 467 U.S. at 87). This standard recognizes that dormant Commerce Clause cases often involve "delicate adjustment of the conflicting state and federal claims," *H.P. Hood & Sons, Inc. v. Du Mond*,

336 U.S. 525, 553 (1949) (Black, J., dissenting), and that "not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States," *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976) (recognizing "States retain broad power to legislate protection for their citizens in matters of local concern").

"If a statute discriminates against out-of-state entities on its face, in its purpose, or in its practical effect, it is unconstitutional unless it 'serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means.'" *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986)). "Absent discrimination, we will uphold the law 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *Id.* at 1087–88 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).[2] "The party challenging the statute bears the burden of showing discrimination." *Black Star Farms, LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010).

## A. Facial Discrimination

The district court did not apply an improper legal standard or clearly err in determining that the ordinance does not facially discriminate against out-of-state entities or interstate commerce. The ordinance does not classify employers based on the location of their headquarters, the location of their workers, or the extent to which they participate in interstate commerce. Rather, it classifies based on the number of

---

[2] IFA does not appeal the district court's application of *Pike*.

employees (a facially-neutral classification) and the business model (a facially-neutral classification). Nor does the ordinance classify based on an employer's links to interstate commerce or out-of-state firms, but on neutral characteristics, such as having a marketing plan, operating a business associated with a trademark, and paying a franchisee fee. Ord. § 2(I). A franchisee affiliated with a network that has 500 employees in the State of Washington and a headquarters in Seattle is treated just like a franchisee affiliated with a franchise that has 10 employees in Washington, 490 in Oregon, and a headquarters in Boston. A franchisee that sources its inputs from Washington and serves local Seattle residents is treated just like a franchisee—or a non-franchisee, for that matter—that sources its inputs from Oregon and serves out-of-state tourists.

IFA contends the ordinance does not impose a facially neutral requirement because it expressly discriminates against franchises. Based on this record, we disagree. A distinction drawn based on a firm's business model—a characteristic IFA contends is highly correlated with interstate commerce—does not constitute facial discrimination against out-of-state entities or interstate commerce. *See Cachia v. Islamorada*, 542 F.3d 839, 843 (11th Cir. 2008) (ban on "formula" restaurants "does not facially discriminate between in-state and out-of-state interests"); *Island Silver & Spice, Inc. v. Islamorada*, 542 F.3d 844, 846 (11th Cir. 2008) (restrictive regulation of "formula" retail establishments "does not facially discriminate against interstate commerce").

At a minimum, the district court did not clearly err in rejecting IFA's correlation. IFA did not establish that Seattle franchisees—the party IFA concedes bears the burden of the ordinance—that pay local taxes and have local representation

are out-of-state entities.  *See S.C. State Highway Dep't v. Barnwell Bros., Inc.*, 303 U.S. 177, 184 n.2 (1938) (political restraints are absent when legislating against out-of-state interests).  Nor did it establish that franchises have such unique links to interstate commerce relative to non-franchises that the ordinance facially discriminates against interstate commerce.

## B.  Discriminatory Purpose

The Ninth Circuit recently stated:

> The party challenging a regulation bears the burden of establishing that a challenged statute has a discriminatory purpose or effect under the Commerce Clause.  We will assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces us to conclude that they could not have been a goal of the legislation.

*Rocky Mountain Farmers Union*, 730 F.3d at 1097–98 (internal citations and quotation marks omitted).  In the context of interpreting statutes, the Supreme Court has consistently held that statutory construction "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–76 (2009) (citation omitted); *see also United States v. O'Brien*, 391 U.S. 367, 383 (1968) (discerning congressional purpose is a hazardous matter).

IFA does not fault the district court for applying an incorrect test or considering irrelevant factors. Rather, it argues that the district court erred in evaluating the evidence of motive.

While the record contains some evidence that City officials and advocates questioned the merits of the franchise business model, the district court did not clearly err in determining that the City Council was not motivated by an intent to discriminate against out-of-state firms or interstate commerce. The text shows the City had a legitimate, non-discriminatory purpose. The preamble states that the ordinance's general purpose is to improve public health and welfare and reduce economic inequality. *See* Ord. Pr. 5; *id.* § 1(11) ("The public welfare, health, and prosperity of Seattle require wages and benefits sufficient to ensure a decent and healthy life for all Seattle workers and their families").

As for the distinction between large and small businesses, the ordinance explains in a finding that "small businesses and not-for-profit organizations may have difficulty in accommodating the increased costs." *Id.* § 1(9). While the preamble does not provide a rationale for the franchisee classification, the definition of franchisees as large employers, *id.* § 2(T)—read in concert with the "small business" finding—supports an inference that the Council viewed franchisees as more akin to large employers than small businesses and not-for-profits in their ability to accommodate increased costs.

In sum, there is strong textual evidence of the Council's general purpose and weaker textual evidence of its purpose with respect to the franchisee classification. Yet, the ordinance's context and structure indicate the purpose behind

classifying franchisees as large employers is their relative ability to accommodate increased costs. Further, discriminatory motives are absent from the text; the ordinance does not demean franchises or describe them as an economic or social ill, nor does it euphemistically call for "diversifying" business ownership or "leveling the playing field." In distinguishing between large and small employers, the ordinance does not use location as a factor, nor does it discuss reliance on local inputs or local customers.

In contrast, statutes struck down for their impermissible purpose have contained language promoting local industry or seeking to level the playing field. *See W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 194 (1994) ("avowed purpose . . . [is] to enable higher cost Massachusetts dairy farmers to compete with lower cost dairy farmers in other States"); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270–71 (1984) (stated reason for exempting "ti root okolehao" from tax was to encourage and promote the establishment of a new industry). IFA cites to no cases in which an ordinance lacking a stated discriminatory purpose was stricken for its impermissible motive.[3]

IFA identifies the following as evidence of improper motive: (1) two emails from IIAC member Nick Hanauer on May 3 and May 31, (2) an email from Robert Feldstein, a member of the Mayor's staff, (3) a statement by Mayor

---

[3] In addition, the context and manner in which the ordinance was enacted does not give rise to a reason to doubt its stated purposes. For instance, the Mayor did not exclude the business community from the IIAC, the ordinance was not debated in secret, and the record does not show that the City has a history of discriminating against out-of-state businesses. Thus, we assume the ordinance's stated purposes are its true purposes. *See Rocky Mountain Farmers Union*, 730 F.3d at 1097–98.

Murray, (4) a tweet by a Councilmember, (5) a statement by Councilmember Licata, and (6) a statement by Councilmember Clark. The district court "considered all of the emails and statements identified by the parties," and reproduced excerpts of many of them in its order.[4]

Of the evidence identified by IFA, Hanauer's emails contain the strongest anti-franchise language. He stated in an email sent May 3:

> [F]ranchises like [S]ubway and McDonalds really are not very good for our local economy. They are economically extractive, civically corrosive and culturally dilutive [sic] . . . . A city dominated by independent, locally owned, unique sandwich and hamburger restaurants will be more economically, civically and culturally rich than one dominated by extractive national chains.

He stated in another email sent May 31:

---

[4] Courts have considered legislative history to determine whether local action was motivated by a discriminatory purpose. *See, e.g.*, *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 683–84 (1981) (Brennan, J., concurring); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951); *see also Edwards v. Aguillard*, 482 U.S. 578, 594 (1987) (plain meaning viewed against context and legislative history can control determination of legislative purpose). Yet, "contemporaneous remarks of a sponsor of legislation are certainly not controlling in analyzing legislative history," *Weinberger v. Rossi*, 456 U.S. 25, 35 n.15 (1982) (citations omitted), and statements by a lobbyist are entitled to little weight, *see, e.g.*, *Bell Atl. Tel. Cos. v. F.C.C.*, 131 F.3d 1044, 1048 (D.C. Cir. 1997).

> [N]ational franchises like McDonalds, or Burger King or KFC, or Subway, simply are not that beneficial to our city. First, these organizations are consistently at the low end of the scale in terms of paying decently and offering benefits. Not all small, locally owned companies take great care of their workers, but none of the national chains do . . . . [O]ur city has no obligation to continue policies that so obviously advantage them and disadvantage the local businesses that benefit our city and it's [sic] citizens more.

While the emails are persuasive evidence of Hanauer's anti-franchise views, they do not show that Hanauer intended to burden out-of-state firms or interfere with the wheels of interstate commerce. More importantly, they also do not show that City officials wished to discriminate against out-of-state entities, bolster in-state firms, or burden interstate commerce.

Thus, IFA failed to demonstrate that Seattle franchisees are out-of-state entities or that franchises are so interstate in character relative to non-franchises that a distinction drawn on this basis interferes with interstate commerce. The district court did not clearly err in rejecting this framework. *See Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978) (dormant Commerce Clause does not protect "particular structure or methods of operation in a retail market" or "particular interstate firms"). Thus, the evidence of anti-franchise views is insufficient to show a discriminatory motive.

Even if we were to accept IFA's premise, the district court did not clearly err in finding that the City did not have an impermissible motive. First, Hanauer's emails are not entitled to substantial weight. Hanauer was not a City Councilmember but one of twenty-four members of the IIAC. Although Mayor Murray created and appointed the members of the IIAC—lending it a quasi-official status—IFA recognizes that the IIAC "did not draft any proposed legislation." And, even if the IIAC is "akin to a legislative committee," as IFA contends, its proposal did not contain the franchise recommendation IFA challenges (citing Ord. § 1(9)). Thus, at most, the emails provide insight into the motive of the body that did not recommend the provision. This is weak evidence of the City's alleged impermissible purpose.

Further, the time line indicates that Hanauer's emails came from the keystrokes of an advocate, not a quasi-official IIAC member, let alone a City official. *See All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 39 (1st Cir. 2005) (statements by a law's private-sector proponents can shed light on its purpose, but "correspondence of a single lobbyist has little (if any) probative value in demonstrating the objectives of the legislative body as a whole") (citations omitted); *see also W. Lynn Creamery*, 512 U.S. at 215 (Rehnquist, C.J., dissenting) ("Analysis of interest group participation in the political process may serve many useful purposes, but serving as a basis for interpreting the dormant Commerce Clause is not one of them."). The emails were not sent until after Mayor Murray publicly announced the IIAC

proposal.**5**  By May 3, the debate was no longer transpiring within the IIAC but between the Mayor, Council, and advocates, Hanauer included.  The district court did not clearly err in assigning Hanauer's emails little weight.

Second, while IFA provides some evidence that City officials criticized the franchise model, the statements it cited are too indirect and limited to overcome the evidence of the provision's permissible purpose.  For instance, a member of the Mayor's staff stated in an email that "[i]f we lose franchises in Seattle, I won't be sad," Mayor Murray stated that "[t]here is a problem in the franchise business model," and Councilmember Clark stated that she was not worried about the ability of franchisees to absorb a higher minimum wage.  Yet, an errant remark in an email sent by a staff member is not a cipher that decodes the City Council and Mayor's motives.  And, the other two comments reflect a debate about the characteristics and resources of franchises, but are not persuasive evidence that the City was motivated by an intent to harm franchises.  The district court did not clearly err in finding that this evidence fell short of demonstrating an impermissible purpose.

### C.  Discriminatory Effects

The district court correctly observed that "decisions interpreting the dormant Commerce Clause appear somewhat difficult to reconcile." *Int'l Franchise Ass'n*, at \*5 n.10; *see Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,

---

**5** *See* Office of Mayor Murray, *Murray: 'We Have a Deal: Seattle Workers Are Getting a Raise'*  (May 1, 2014), available at http://murray.seattle.gov/murray-we-have-a-deal-seattle-workers-are-getting-a-raise/#sthash.w1yKnLXX.dpbs.

476 U.S. 573, 579 (1986) (recognizing "that there is no clear line" separating legislation with discriminatory effects from legislation with indirect effects). This is particularly the case here, where we assess an ordinance that does not resemble an established type of dormant Commerce Clause case.[6] Rather, the measure arguably imposes costs on a class of businesses said to be highly correlated with out-of-state firms or interstate commerce.

We lack Supreme Court authority assessing whether a regulation affecting franchises ipso facto has the effect of discriminating against interstate commerce. Nor has the Supreme Court addressed whether franchises are instrumentalities of interstate commerce that cannot be subjected to disparate regulatory burdens. While regulations that expressly classify based on business structure or impose disparate burdens on franchises present interesting questions, our review is limited to considering whether the district court applied improper legal principles or clearly erred in reviewing the record.[7]

---

[6] Emblematic examples include *South-Central Timber*, 467 U.S. at 104 (processing requirement); *Dean Milk Co.*, 340 U.S. at 354 (same); *Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1792 (2015) (preferential taxation); *City of Phila. v. New Jersey*, 437 U.S. 617, 622 (1978) (import ban); *Hunt v. Wa. State Apple Adver. Comm'n*, 432 U.S. 333, 352 (1977) (regulatory preference for domestic products); *W. Lynn Creamery*, 512 U.S. at 188–90 (tariff-like price manipulation of imported goods); *Walgreen v. Rullan*, 405 F.3d 50, 52–53, 56–57 (1st Cir. 2005) (excluding out-of-state service providers).

[7] We briefly observe that several courts have considered whether measures that affect national chains violate the dormant Commerce Clause. *See Cachia*, 542 F.3d at 843; *Island Silver*, 542 F.3d at 846; *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 15 (1st Cir. 2007); *Wal-Mart Stores v. City of Turlock*, 483 F. Supp. 2d 987, 991 (E.D. Cal.

2006); *Great Atl. & Pac. Tea Co., Inc. v. Town of E. Hampton*, 997 F. Supp. 340, 344–45, 351 (E.D.N.Y. 1998). The decisions are not clearly reconcilable, with two district courts upholding prohibitions on retailers wishing to build large establishments, *Turlock*, 483 F. Supp. 2d at 1012–14; *Hampton*, 997 F. Supp. at 351, and the Eleventh Circuit striking down size-based and franchise-based prohibitions, *Cachia*, 542 F.3d at 843 (prohibition of chain restaurants "disproportionately targets restaurants operating in interstate commerce"); *Island Silver*, 542 F.3d at 846–47 (measure effectively eliminates "all new interstate chain retailers"). In addition, *Cachia* and *Island Silver* are at odds with the First Circuit's rejection of a Commerce Clause challenge to Rhode Island's prohibition against chains and franchises owning and operating liquor stores. *Wine & Spirits Retailers*, 481 F.3d at 15 ("[A] negative impact on [plaintiff's] business model is, in itself, insufficient to show discriminatory effect."). These cases do not affect our conclusion that Seattle's ordinance passes muster under the dormant Commerce Clause. Unlike *Cachia*, *Island Silver*, and decisions that have stricken measures that limit competition, *see, e.g.*, *H.P. Hood & Sons*, 336 U.S. at 545 (statute required agency to deny licenses to a new milk dealer if the market was "already adequately served"); *Granholm v. Heald*, 544 U.S. 460, 473–74 (2005) (statute prohibited out-of-state wineries from directly shipping wine to in-state consumers); *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 39 (1980) (statutes prevented out-of-state banks from owning in-state subsidiary banks or businesses offering investment advisory services to banks); *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1257–59 (11th Cir. 2012) (permitting process required only new entrants to apply and "made entry impossible"); *Walgreen*, 405 F.3d at 52–53, 56–57 (new pharmacies required to obtain certificate of necessity), Seattle's minimum wage ordinance does not limit competition by prohibiting chain retailers and restaurants. Moreover, Seattle may impose additional burdens on businesses that have adopted a franchise business structure without running afoul of the dormant Commerce Clause. *See Exxon*, 437 U.S. at 127 (dormant Commerce Clause does not protect the "particular structure or methods of operation in a retail market"); *Nat'l Ass'n of Optometrists and Opticians LensCrafters*, *Inc. v. Brown*, 567 F.3d 521, 527 (9th Cir. 2009) (under the dormant Commerce Clause, "states may legitimately distinguish between business structures in a retail market").

### i.  Legal Standards

IFA contends that the district court cited and applied two improper legal standards in its discriminatory effects analysis: (1) the evidentiary burden; and (2) the standard to determine whether a statute causes discriminatory effects.

IFA's argument that the district court abused its discretion by requiring a heightened evidentiary standard is unpersuasive.  Two recent decisions from our court establish that a plaintiff must satisfy a higher evidentiary burden when, as here, a statute is neither facially discriminatory nor motivated by an impermissible purpose. *See Rocky Mountain Farmers Union*, 730 F.3d at 1100; *Black Star Farms*, 600 F.3d at 1232.  Our approach is not an outlier. *See Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 37 (1st Cir. 2007) ("There must be substantial evidence of an actual discriminatory effect").  It was not error to apply these precedents.

IFA raises a somewhat stronger but ultimately unsuccessful point when it contends that the district court erred in requiring evidence that the "law causes local goods to constitute a larger share and goods with an out-of-state source to constitute a smaller share of the market." *Int'l Franchise Ass'n*, at *10.  However, the district court did not err in considering this test, among others, because "if the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market," then "the regulation may have a discriminatory effect on interstate commerce." *Exxon Corp.*, 437 U.S. at 126 n.16. Nevertheless, this is not the only test to determine whether a measure has discriminatory effects.  While the "mix of

goods" test is an apt one to evaluate statutes that impose tariffs on goods, this ordinance is alleged to impair the competitiveness of businesses such as hotels and restaurants. IFA does not contend that the ordinance will restrict the flow of goods.

But the district court did not limit its analysis to the "mix of goods" test. The district court also evaluated whether the ordinance would cause franchisees to suffer a "competitive disadvantage as compared to other similarly situated small businesses," *Int'l Franchise Ass'n*, at \*11, "increas[e] costs for a particular type of business model," *id.*, create barriers to entry, *id.* at \*13, raise labor costs "in a way that will impact the flow of interstate commerce," *id.*, cause franchisees to close or reduce operations, *id.*, or generally affect interstate commerce, *id.* at \*13–14. Thus, the court considered measures well-suited to evaluating the effects of the ordinance. *See New Energy Co. of Ind.*, 486 U.S. at 274; *W. Lynn Creamery*, 512 U.S. at 194–96. While the "mix of goods" test was on its own insufficient, the court did not err, as it evaluated a range of possible effects.

## ii. *Substantial Evidence of Discriminatory Effects*

The district court did not clearly err in finding that IFA did not provide substantial evidence showing that the ordinance will have discriminatory effects on out-of-state firms or interstate commerce. IFA's showing that 96.3 percent of Seattle franchisees are affiliated with out-of-state franchisors, and that in-state franchisees will be placed at a competitive disadvantage, does not prove that the ordinance will have a discriminatory effect on out-of-state firms. IFA's offering does not tend to prove that costs will be imposed on out-of-state firms, out-of-state firms will be at a competitive

disadvantage, out-of-state businesses will close, or that new out-of-state firms will not enter the market.

Rather, to the extent the ordinance has an effect, its primary or perhaps exclusive effect is to harm in-state firms—franchisees located in Seattle. These in-state firms will face a higher wage requirement relative to franchisees outside of Seattle and non-franchisees.[8] *See Gen. Motors Corp.*, 519 U.S. at 298–99 (effects analysis should evaluate similarly-situated entities). Alternatively, the ordinance can be viewed as harming one type of in-state entity (franchisees) while benefitting another type of in-state entity (non-franchisees). Neither comparison shows that in-state economic interests are benefitted by burdening out-of-state competitors. *See Dep't of Revenue of Ky.*, 553 U.S. at 338.

IFA does not present evidence of the ordinance's effect on out-of-state firms. The record does not discuss diminished franchisor royalties or profitability, or show that future franchise development in Seattle will be impaired. The only thing the affiliation rate shows is that most in-state franchisees have out-of-state relationships and are subject to a disparate minimum wage requirement. The district court did not clearly err in determining that IFA did not, at this stage in the proceeding, provide substantial evidence of discriminatory effects on out-of-state firms.

---

[8] Because the district court determined that the IFA failed to produce evidence showing that the Seattle ordinance had a discriminatory effect even if franchisees and independent small businesses were similarly situated, we need not reach the question whether the district court erred in concluding that franchisees and non-franchisees are not similarly situated.

Nor did the district court err in finding that the ordinance does not have the effect of discriminating against interstate commerce. The rate of out-of-state franchise affiliation tells us very little about the ordinance's effect on interstate commerce. IFA does not demonstrate how a wage requirement imposed on in-state franchisees affects interstate commerce. The ordinance's effects appear to be highly local. Indeed, IFA concedes that franchisees independently pay the "operating costs of their businesses" including "wages" and that "[n]o other party shares in these small business obligations." In other words, in-state franchisees are burdened, not the wheels of interstate commerce. *Cf. Cachia*, 542 F.3d at 840; *Island Silver*, 542 F.3d at 846 (prohibiting national chains has the effect of discriminating against interstate commerce).

Even crediting IFA's contention that a disparate impact on national chains discriminates against interstate commerce, the district court did not clearly err in finding that the affiliation rate and franchisee declarations provided by IFA were insufficient. The record does not show that interstate franchise networks will face higher costs or reduce their investment and operations in Seattle, nor does it show that the ordinance will discourage the flow of goods in interstate commerce.

In sum, the evidence that the ordinance will burden interstate commerce is not substantial. It does not show that interstate firms will be excluded from the market, earn less revenue or profit, lose customers, or close or reduce stores. Nor does it show that new franchisees will not enter the

market or that franchisors will suffer adverse effects.  The district court did not clearly err.[9]

## II. Equal Protection Clause

"In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (citations omitted).  The district court properly cited the rational-basis standard.  *Int'l Franchise Ass'n*, at *15 (citing *F.C.C.*, 508 U.S. at 315).

The district court did not clearly err in finding a legitimate purpose in the classification and a rational relationship between franchisees and their classification as

---

[9] Nor did the district court err in rejecting IFA's contention that the ordinance is "tantamount to a tariff on interstate business activity and thus clearly proscribed by the Commerce Clause."  A tariff is a "schedule or system of duties imposed by a government on imported or exported goods," *Tariff*, Black's Law Dictionary (10th ed. 2014), and a tax is a "charge, usu[ally] monetary, imposed by the government on persons, entities, transactions, or property to yield public revenue," *Tax*, Black's Law Dictionary (10th ed. 2014).  The cases IFA cited either involved duties on imported goods, *W. Lynn Creamery*, 512 U.S. at 188–90 , or taxes yielding public revenue, *Wynne*, 135 S. Ct. at 1792; *Best & Co. v. Maxwell*, 311 U.S. 454, 454–57 (1940); *Alpha Portland Cement Co. v. Commonwealth of Mass.*, 268 U.S. 203, 219 (1925).  The measures at issue in these cases do not resemble the Seattle ordinance, which does not reduce the competitiveness of out-of-state goods (and hence is not tariff-like) or impose differential taxes that yield public revenue.  No case or legal principle identified by IFA converts a geography-neutral regulatory measure into a tariff or tax.

large employers.    The court found that a "reasonably conceivable state of facts" could support the classification based on "the economic benefits flowing to franchisees" and franchisees' ability to "handle the faster phase-in schedule." *Id.* at \*16–17.    The court based its determination on declarations from experts on franchises, as well as individual franchisees.

Even if the relationship between the advantages enjoyed by franchisees and their ability to handle the faster phase-in schedule lacks strong support, the City's determination does not require empirical data, and the classification is entitled to a "strong presumption of validity."  *F.C.C.*, 508 U.S. at 314. IFA did not negate every possible rationalization for the classification, *see Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973), and the district court did not clearly err in finding that the classification survived rational-basis review.

Nor is the classification the result of "mere animus or forbidden motive."  As a threshold matter, this argument fails because the district court did not clearly err in finding a legitimate, rational basis for the City's classification.  *Cf. Romer v. Evans*, 517 U.S. 620, 635 (1996) (amendment does not further a proper legislative end).  It is legitimate and rational for the City to set a minimum wage based on economic factors, such as the ability of employers to pay those wages.[10]

_____

[10] The animus argument also fails because most of the cited evidence consists of statements of IIAC members.  The district court did not err in finding these statements to be of little value in determining the motivations of the City Council and Mayor.  Even if the IIAC member statements were probative of the City's intent, the statements reflect a

## III.      First Amendment

IFA argues that the ordinance discriminates on the basis of protected speech because two of the three definitional criteria for franchises are based on speech and association—operating under a marketing plan prescribed by a franchisor and associating with a trademark or other commercial symbol.  This construction of the ordinance is unpersuasive.  "[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct . . . . [T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."  *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011); *see also Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983).   The threshold question is whether conduct with a "significant expressive element" drew the legal remedy or the ordinance has the inevitable effect of "singling out those engaged in expressive activity."  *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986).

---

legislative debate about the merits of the franchise model and do not show the City's "bare [] desire to harm a politically unpopular group . . . ." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).  The evidence does not indicate that the City engaged in the type of invidious discrimination reserved for this area of Equal Protection jurisprudence.  *Cf. Romer*, 517 U.S. at 635 (striking down an amendment that "classifie[d] homosexuals not to further a proper legislative end but to make them unequal to everyone else."); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) (holding that the application of a zoning ordinance was based on "irrational prejudice" against those with disabilities).

Seattle's minimum wage ordinance is plainly an economic regulation that does not target speech or expressive conduct. The conduct at issue—the decision of a franchisor and a franchisee to form a business relationship and their resulting business activities—"exhibits nothing that even the most vivid imagination might deem uniquely expressive." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 53 (1st Cir. 2005) (discussing business activities of franchisee and franchisor). A business agreement or business dealings between a franchisor and a franchisee is not conduct with a "significant expressive element." *Cf. Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569–70 (1995) (compiling instances of communicative conduct). Nor does the statute "singl[e] out those engaged in expressive activity" such as newspapers or advocacy organizations. *Cf. Minneapolis Star*, 460 U.S. at 581 ("special tax that applies only to certain publications").

The ordinance, like a statute barring anti-competitive collusion, *e.g.*, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949), is not wholly unrelated to a communicative component, but that in itself does not trigger First Amendment scrutiny. *See Arcara*, 478 U.S. at 708 (subjecting every incidental impact on speech to First Amendment scrutiny "would lead to the absurd result that any government action that had some conceivable speech-inhibiting consequences, such as the arrest of a newscaster for a traffic violation, would require analysis under the First Amendment") (O'Connor, J., concurring). Although the franchisees are identified in part as companies associated with a trademark or brand, the ordinance applies to businesses that have adopted a particular business model, not to any message the businesses express. *Cf. Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) ("Government regulation of

speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."). It is clear that the ordinance was not motivated by a desire to suppress speech, the conduct at issue is not franchisee expression, and the ordinance does not have the effect of targeting expressive activity. The district court did not err in finding IFA did not show, on this record, a likelihood of success on this claim.

## IV.    Lanham Act Preemption

IFA's preemption argument alleges that because the ordinance defines franchisees in part based on their shared use of a trademark, it frustrates the purposes and objectives of the Lanham Act. The district court correctly ruled that IFA did not show a likelihood of succeeding on this claim, as the ordinance does not conflict with the purposes of the Act.

As the Lanham Act does not expressly preempt state law, *Mariniello v. Shell Oil Co.*, 511 F.2d 853, 857 (3d Cir. 1975), and courts have said that it does not occupy the field, *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 41 (1st Cir. 2006), the ordinance can only be preempted if it conflicts with the Lanham Act, *see generally Freightliner Corp. v. Myrick*, 514 U.S. 280, 286–87 (1995) (local laws can be preempted expressly, when Congress occupies the field, or when state law conflicts with or frustrates the purpose of statute).

IFA does not indicate which provision of the Lanham Act preempts the ordinance, apart from a general purposive statement in the Act that it is designed to "protect registered marks used in such commerce from interference by State, or territorial legislation . . . ." 15 U.S.C. § 1127. The Act does not discuss the regulation of wages or employment conditions

or establish that classifications based on trademark use are impermissible.

The value of the purpose language is limited by the absence of operative language. Oft-cited language in the Senate Report accompanying the statute clarifies Congress's motives:

> The purpose underlying any trade-mark statute is twofold. One is to protect the public so it may be confident that . . . it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.

S. Rep. No. 79-1333, at 1274.

A number of courts have cited this language in assessing whether measures affecting—but not directly regulating—trademarks are preempted. For instance, the Third Circuit affirmed a rule barring franchisors from terminating a franchise without cause, rejecting the argument that it was preempted by the Lanham Act because "[n]o deception of the public is suggested and no dilution of [an] investment in its trademark is alleged to have occurred." *Mariniello*, 511 F.2d at 858.

Similarly, the Utah Supreme Court determined that a state criminal statute penalizing passing counterfeit goods containing federally registered trademarks does not conflict with the Lanham Act because it does not "permit confusing

or deceptive trademarks to operate, infringing on the guarantee of exclusive use to federal trademark holders." *State v. Frampton*, 737 P.2d 183, 191 (Utah 1987) (quoting *Mariniello*, 511 F.2d at 858); *see also Am. Petroleum Inst. v. Cooper*, 718 F.3d 347, 359 (4th Cir. 2013) ("[U]nder the Lanham Act, the mark holder has a right to maintain the quality of the goods bearing its mark, and when a state statute does not significantly interfere with that right, there is no preemption."); *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 352 (9th Cir. 1980) (similar, citing *Mariniello*). Applying this standard, the ordinance does not interfere with a franchise's ability to maintain quality, compromise the public's confidence in trademarks, allow misappropriation, or directly interfere with or regulate marks. Thus, the ordinance is not preempted by the statute.[11]

Further, it has not been shown that Congress clearly intended to preempt an ordinance of this nature. *See N.Y. State Conference of Blue Cross & Blue Shield Plans v.*

---

[11] A second body of law—addressing local authority to regulate signs bearing trademarks—cuts against IFA's position as well. Interpreting a provision in the Act prohibiting localities from "requir[ing] alteration of a registered mark," 15 U.S.C. § 1121(b), we determined that "a zoning ordinance may not require a change in a registered mark" but may "prohibit the display of a registered mark." *Blockbuster Videos, Inc. v. City of Tempe*, 141 F.3d 1295, 1300–01 (9th Cir. 1998); *see also Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 1999) (allowing cities to control "the color, design elements, or character of outdoor signs"). Thus, despite a prohibition on altering trademarks and the purpose of protecting trademark holders, cities may bar mark-holders from displaying trademarks and in some jurisdictions may regulate their color and size. The burden that an ordinance can place on the use of the mark *itself* far outstrips the burden that the Seattle ordinance places on trademark holders and constitutes far greater interference with the use of trademarks.

*Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("[W]here federal law is said to bar state action in fields of traditional state regulation, we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'") (citation omitted) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Here, we assess a field of traditional state regulation, minimum wages to be paid to employees, and the text of the Lanham Act does not indicate an intent to preempt such an ordinance. It was not error for the district court to find IFA unlikely to succeed on this claim.

## V.  Washington State Constitution

Article I, section 12 of the Washington Constitution provides:  "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens or corporations."  Washington courts employ a two-step inquiry to determine whether a law violates the privileges and immunities clause: (1) whether the law in question involves a privilege or immunity; if not, the provision is not implicated; but (2) if so, whether the legislative body had a "reasonable ground" for granting the privilege or immunity.  *Ockletree v. Franciscan Health Sys.*, 179 Wash. 2d 769, 776 (2014).

IFA's claim that the ordinance violates the state constitution is unpersuasive at both steps.  The district court correctly concluded that the provision is not violated "anytime the legislature treats similarly situated businesses differently."  *Int'l Franchise Ass'n*, at *22.  Rather, "the terms 'privileges and immunities' pertain alone to those

fundamental rights which belong to the citizens of the state by reason of such citizenship." *Grant Cnty. Fire Prot. Dist. No. 5 v. City of Moses Lake*,150 Wash. 2d 791, 812-13 (2004) (citing *State v. Vance*, 29 Wash. 435, 458 (1902)). Accordingly, legislative classifications only constitute a privilege "where it is, 'in its very nature, such a fundamental right of a citizen that it may be said to come within the prohibition of the constitution, or to have been had in mind by the framers of that organic law.'" *Ockletree*, 179 Wash. 2d at 778 (quoting *Vance*, 29 Wash. at 458–59). IFA was required to show that the classification derogated a fundamental right of citizens and failed to do so. *Compare Ralph v. City of Wenatchee*, 34 Wash. 2d 638, P. 2d 270, 272 (1949) (striking down regulation that "substantially [] prohibited . . . non-resident photographers"), *with Ass'n of Wa. Spirits & Wine Distribs. v. Wa. State Liquor Control Bd.*, 182 Wash. 2d 342, 362 (2015) (upholding differential fees on spirits industry according to position in distribution chain).

We also affirm because the classification rests on "'real and substantial differences bearing a natural, reasonable, and just relation to the subject matter of the act.'" *Ockletree*, 179 Wash. 2d at 783 (quoting *State ex rel. Bachich v. Huse*, 187 Wash. 75, 84 (1936)). The City determined that franchisees have material advantages over non-franchisees that affect their ability to absorb increases in the minimum wage—a distinction related to the ordinance's subject matter.

## VI.      Remaining Preliminary Injunction Factors

### A.  Irreparable Harm

IFA contends that franchisees will suffer competitive injury, lose customers and goodwill, and go out of business.

The district court disagreed, finding the "allegations []
conclusory and unsupported by the facts in the record." *Int'l
Franchise Ass'n*, at \*24.

The district court, however, did err in evaluating IFA's
evidence of competitive injury. A rule putting plaintiffs at a
competitive disadvantage constitutes irreparable harm. *See
Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir. 1991);
*Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521,
525–26 (9th Cir. 1984). The declarations of franchise owners
and the ordinance's text indicate that franchisees will face a
higher minimum wage obligation compared to non-
franchisees. Franchisees will experience higher labor costs
or lose the flexibility to pay workers the wage rate required
of non-franchisees. The allegations are neither conclusory
nor without support in the record.

Seattle offers some evidence showing that the ordinance
may result in a higher wage rate for all employers and that the
injury is merely speculative. Furthermore, Seattle's experts
observe that higher labor costs may actually attract new
customers and improve productivity. While the evidence is
mixed, we find that the court erred in rejecting IFA's
evidence of competitive injury.

In contrast, IFA did not show that franchisees face
irreparable harm as a result of losing customers or goodwill.
The only evidence supporting these allegations is the
speculation of franchise owners that higher wages will result
in higher prices and reduce demand. The record does not
discuss the costs and revenues of these businesses, the
performance of non-franchisees, current or future labor costs,
the proportion of employees earning more than the minimum,
or the elasticity of demand for goods and services provided

by franchisees. Thus, it is impossible to evaluate whether franchisees will need to raise prices or whether price changes will result in decreased demand. The chain of events suggested by IFA is speculation that does not rise beyond the mere "possibility" of harm. *Winter*, 555 U.S. at 22.

## B. Balance of Hardships and Public Interest

The district court also erred in finding that IFA did not demonstrate that the balance of hardships tips in its favor. The inquiry is not between franchisees and workers, but rather between the parties—franchisees and the City. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137 (9th Cir. 2011). If the ordinance goes into effect, franchisees will face a higher wage requirement than their competitors. In contrast, the City did not make a persuasive showing that it would experience hardships from the issuance of a preliminary injunction.

In contrast, the district court did not err in concluding that the public interest disfavors an injunction. Granting a preliminary injunction would likely result in many workers receiving reduced wages. *See Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003) (evaluating impact on non-parties). Seattle voters would see part of a law passed as a result of an election enjoined. *See Golden Gate Rest. Ass'n v. City of S.F.*, 512 F.3d 1112, 1116 (9th Cir. 2008). IFA did not provide persuasive evidence showing that the public interest would suffer as a result of allowing the ordinance to take effect. The district court did not clearly err.

## VII.    Serious Questions Test

A plaintiff is alternatively entitled to a preliminary injunction by raising serious questions going to the merits and showing a balance of hardships that tips sharply in the plaintiff's favor, a likelihood of irreparable injury, and that an injunction serves the public interest.  *All. for the Wild Rockies*, 632 F.3d at 1135 (plaintiff must make a showing on all four prongs).  Though the district court failed to include all *Winter* factors, *Int'l Franchise Ass'n*, at *25, it ultimately reached the proper conclusion because IFA did not raise serious questions going to the merits on any of its claims, nor did it show that an injunction is in the public interest.

## CONCLUSION

We affirm the district court's denial of IFA's motion for a preliminary injunction.  The district court applied the correct legal standards and did not clearly err in its factual determinations.

**AFFIRMED.**